1  James A. Goodman, State Bar No. 89715
   J. Susan Graham, State Bar No. 128123
2  EPSTEIN BECKER & GREEN, P.C.
   1925 Century Park East, Suite 500
3  Los Angeles, California 90067-2506
   Telephone:    310.556.8861
4  Facsimile:    310.553.2165
   jgoodman@ebglaw.com
5  sgraham@ebglaw.com

6  Attorneys for Defendant,
   BLACKROCK, INC.
7

8              UNITED STATES DISTRICT COURT

9            NORTHERN DISTRICT OF CALIFORNIA

10

11 THOMAS H. RUDWALL,                    CASE NO.  CV 09-05176 (TEH)

12        Plaintiff,                     [State Complaint No. CGC 89-492419
                                         Filed September 10, 2009]
13     v.
                                         **DEFENDANT BLACKROCK, INC.'S**
14 BLACKROCK, INC., and DOES 1 through   **NOTICE OF MOTION FOR PARTIAL**
   10, inclusive,                        **SUMMARY JUDGMENT AND**
15                                       **MEMORANDUM OF POINTS AND**
                                         **AUTHORITIES IN SUPPORT THEREOF**
16        Defendants.
                                         [Filed and Served Concurrently with
17                                       Declarations of Gurinder Dosanjh, James A.
                                         Goodman, Simon Mendelson, and John Moran]
18
                                         DATE:        February 7, 2011
19                                       TIME:        10:00 a.m.
                                         CTRM:        12, 19th Floor
20
                                         Trial Date:    March 29, 2011
21                                       Hon. Thelton E. Henderson

22

23

24

25

26

27

28

---

FIRMWEST:2049706v7       DEFENDANT BLACKROCK, INC.'S NOTICE OF MOTION AND  MOTION
                         FOR PARTIAL SUMMARY JUDGMENT – CASE NO. CV 09-05176 (TEH)

1

## TABLE OF CONTENTS

2

PAGE NO.

3    I.      INTRODUCTION AND SUMMARY OF ARGUMENT ...................................................1

4    II.     SUMMARY OF FACTS ...................................................................................................5

5    III.    LEGAL ARGUMENT...................................................................................................12

6            A.      RUDWALL'S AGE DISCRIMINATION CLAIM..............................................12

7                    1.      Under Guz and McDonnell Douglas, Rudwall Cannot
                             Establish a Prima Facie Case of Age Discrimination Based
8                            on Disparate Treatment.................................................................................12

9                    2.      BlackRock's Reasons for Terminating Rudwall's
                             Employment Were Unrelated to His Age ...................................................16
10

11                   3.      Impact of Gross Decision Upon Plaintiff's  Burden of Proof
                             in Disparate Treatment Claim .....................................................................18

12                   4.      Rudwall's Disparate Impact Theory Also Fails.........................................19

13           B.      Rudwall's Third Claim for Relief for "Breach of Contract
                     Covenant of Good Faith and Fair Dealing" is Without Merit .............................21
14
             C.      Quantum Meruit Claim......................................................................................21
15
             D.      Rudwall's Fifth Claim for Wrongful Termination in Violation of
16                   Public Policy Claim Has No Merit ........................................................................22

17   IV.     CONCLUSION................................................................................................................23

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

PAGE NO(S).

## FEDERAL CASES

Allen v. Pacific Bell,
   212 F.Supp.2d 1180 (C.D. Cal. 2002) ................................................................14

Beale v. GTE California,
   999 F.Supp. 1312 ..............................................................................................20

Bradley v. Harcourt, Brace & Co.,
   104 F.3d 267 (1996)............................................................................................17

Brinson v. Linda Rose Joint Venture,
   53 F.3d 1044 (9th Cir. 1995) .............................................................................19

Celotex Corp. v. Catrett,
   477 U.S. 317, 106 S.Ct. 2548 (1986)................................................................19

Coleman v. Quaker Oats Co.,
   232 F.3d 1271 (9th Cir. 2000) ..........................................................1, 4, 16, 17

Diaz v. Federal Express Corp.,
   373 F.Supp.2d 1034 (C.D. Cal. 2005) ..............................................................21

E.E.O.C. v. McDonnell Douglas Corp.,
   191 F.3d 948 (8th Cir. 1999) .............................................................................20

Gross v. FBL Financial Services,
   U.S 129 S. Ct. 2343 (2009)...................................................................4, 18, 19

Hanebrink v. Brown Shoe Co.,
   110 F.3d 644 (8th Cir. Mo. 1997).................................................................17, 20

Katz v. Regents of the University of California,
   229 F.3d 831 (9th Cir. 2000) .............................................................................19

McDonnell Douglas Corp. v. Green,
   411 U.S. 792 (1973)..............................................................3, 12, 13, 16, 18, 19

Nidds v. Schindler Elevator Corp.,
   113 F.3d 912 (9th Cir. 1996) .............................................................................14

Reeves v. Sanderson Plumbing Prods.,
   530 U.S. 133 (2000)......................................................................................16, 18

Rose v. Wells Fargo & Co.,
   902 F.2d 1417 (9th Cir. 1990) ..........................................................................20

## TABLE OF AUTHORITIES (cont.)

PAGE NO(S).

Wallis v. J.R. Simplot,
   26 F.3d 885 (9th Cir. 1994) .......................................................................................13

Wynn v. NBC,
   234 F. Supp. 2d 1067 (C.D. Cal. 2002) .....................................................................18

**STATE CASES**

Careau & Co. v. Sec. Pac. Bus. Credit, Inc.,
   222 Cal. App. 3d 1371 (1990) ..............................................................................4, 21

Carter v. CB Richard Ellis, Inc.,
   122 Cal. App. 4th 1313 (2005) ...................................................................................22

Carter v. Escondido Union High School Dist.,
   148 Cal. App. 4th 922 56 Cal. Rptr. 3d 262 (2007)..........................................20, 22

Farnham v. Superior Court,
   60 Cal. App. 4th 69 (1997) .........................................................................................17

Guz v. Bechtel National, Inc.,
   24 Cal. 4th 317 (2000) ...........................................................4, 12, 13, 14, 17, 18

Hedging Concepts v. First Alliance Mortgage Co.,
   41 Cal. App. 4th 1410 (1996) ...............................................................................4, 22

Hersant v. Department of Social Services,
   57 Cal. App. 4th 997 (1997) .......................................................................................13

Horn v. Cushman & Wakefield Western,
   72 Cal. App. 4th 798 (1999) ..................................................................................4, 17

Reid v. Google, Inc.,
   50 Cal. 4th 512 (2010) ....................................................................3, 13, 14, 15

Turner v. Anheuser-Busch, Inc.,
   7 Cal. 4th 1238 (1994) ................................................................................................22

**STATUTES**

California Government Code
   Section 12940(a) ...................................................................................................1, 12

California Penal Code
   Section 631....................................................................................................................16
   Section 632....................................................................................................................16

1

## <u>TABLE OF AUTHORITIES (cont.)</u>

2
<span style="float:right">P<small>AGE</small> N<small>O(S)</small>.</span>

3
**<u>OTHER AUTHORITIES</u>**

4
Federal Rules of Civil Procedure
   Rule 56(e)(2) ................................................................................................................. 1, 19`

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TO PLAINTIFF THOMAS RUDWALL AND HIS ATTORNEYS OF RECORD:**

Notice is hereby given that on February 7, 2011 at 10:00 a.m. in Courtroom 12 of the above-entitled Court, located at 450 Golden Gate Avenue, San Francisco, California  94102, before the Hon. Thelton E. Henderson, Defendant BlackRock, Inc., pursuant to Federal Rules of Civil Procedure Rule 56, will and hereby does move the Court for partial summary judgment.

Defendant seeks judgment on Plaintiff's claim for age discrimination (1st claim for relief); breach of contract implied covenant of good faith and fair dealing (3rd claim); quantum meruit (4th claim); and wrongful termination in violation of public policy (fifth claim).  As to the first claim for age discrimination, Defendant seeks, in the alternative, that the court enter an order establishing that the following issues in this action are established without substantial controversy and that no further proof hereof shall be permitted at trial:  1) that Rudwall's claim for age discrimination based on a disparate treatment theory fails as a matter of law;  and 2) that Rudwall's claim for  age discrimination based on a disparate impact theory fails as a matter of law.

## I.    INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiff Thomas Rudwall ("Rudwall") sues his former employer, defendant BlackRock, Inc. ("BlackRock") for disparate treatment and disparate impact age discrimination in violation of the Fair Employment and Housing Act, Cal. Govt. Code § 12940 ("FEHA"), wrongful termination in violation of public policy, breach of employment contract, and other claims arising out of his former employment with BlackRock.  During his employment with BlackRock, Rudwall sold money market funds in BlackRock's "Direct Channel" division.

In November 2008, in response to the global financial crisis, BlackRock implemented a reduction-in-force ("RIF") resulting in the termination of Rudwall's employment, along with that of 568 other BlackRock employees and two other salespeople in the Direct Channel division.[1] "A RIF is a legitimate non-discriminatory reason for laying off an employee."  Coleman v. Quaker Oats Co., 232 F.3d 1271, 1282 (9th Cir. 2000).  Rudwall had a well-documented history

---

[1] Evidentiary references to factual assertions are set forth in the Summary of Facts section, *infra*. The deposition excerpts on which Defendant relies in support of this motion are attached to the Declaration of James A. Goodman ("Goodman Dec.") filed concurrently herewith.

1   of performance issues during his employment with BlackRock and more than once BlackRock

2   considered terminating his employment based on his performance and conduct.  Although it had

3   elected to work with him over the course of several years in a largely unsuccessful attempt to

4   correct his performance deficiencies and repair his relationship with the company, when

5   BlackRock made the decision to reduce its workforce, Rudwall was an obvious choice to be

6   included in the RIF.  Age was not a factor in the decision and Rudwall cannot point to any

7   evidence to support an inference of age discrimination.

8           •   Rudwall's Employment History

9           For many years prior to the RIF, Rudwall and BlackRock had a tumultuous employment

10  history, marked by increasing acrimony on Rudwall's part toward his employer and increasing

11  frustration by BlackRock with Rudwall's work performance and attitude - - none of which had

12  anything to do with Rudwall's age.  Rudwall repeatedly complained to BlackRock about his

13  employment.  Based upon Rudwall's own testimony, there had been a tense relationship between

14  the parties for close to 10 years -- since 1999.  In fact, Rudwall's dissatisfaction was so high that

15  in 2006, while still employed with BlackRock, Rudwall filed an unsuccessful lawsuit against the

16  company for defamation based upon his managers' assessment of his performance as stated in a

17  performance review.

18          At the same time, BlackRock was disappointed with Rudwall's performance and attitude.

19  Rudwall received poor performance reviews for several years prior to the RIF and BlackRock

20  was forced to assign Rudwall his own personal supervisor, while all of the approximately

21  thirteen other Direct Channel sales representatives were managed by a different supervisor.  In

22  short, BlackRock found Rudwall to be an extremely difficult employee to manage given his

23  litigious nature;[2] his reluctance to accept changes in BlackRock's compensation policies; his

24  reluctance to use the company's established electronic sales recordkeeping system; and his

25  reluctance to follow the company's established team approach.  BlackRock's assessment of

26  Rudwall had nothing to do with his age..

27

28         [2] Rudwall is an attorney who practiced law before becoming a salesman.  Depo of Thomas
Rudwall, ("Rudwall Depo." 8:18-10:4.)

- The Decision to Include Rudwall in the RIF

Rudwall's difficult history with BlackRock was well-known to Simon Mendelson ("Mendelson"), the individual primarily responsible for the decision to include Rudwall in the RIF.  Mendelson regularly communicated with Rudwall in the two years prior to the RIF and received feedback from Rudwall's former managers.  Rudwall claims he was a star performer - - and superior to some of the Direct Channel salespeople who were not included in the RIF - - because his client assets under management were higher than some.  BlackRock, however, viewed it differently and believed Rudwall's sales performance was disappointing in light of the "cash-rich" territory to which he had been assigned, which included the Silicon Valley, as well as his many years of experience in sales and his extensive contacts in the financial industry.  Mendelson communicated these concerns to Rudwall.  In addition to BlackRock's disappointment in the amount of the assets Rudwall maintained for the company, it was not impressed by his other performance metrics.  Mendelson believed that Rudwall would not change his attitude toward the company or accept its new business model, a model that had been in place for several years as of 2008 and was a marked departure from the commission-based, "numbers-oriented" approach Rudwall favored.

- The Legal Claims Against BlackRock

BlackRock now moves for partial summary judgment on Rudwall's claims for age discrimination, breach of contract implied covenant of good faith and fair dealing; quantum meruit, and wrongful termination in violation of public policy.  The disposition of these claims will substantially narrow the claims to be tried and limit the relief available to Rudwall.

Rudwall's disparate treatment age discrimination claim fails as a matter of law as Rudwall cannot establish a *prima facie* case of age discrimination.  Further, Blackrock had legitimate, non-discriminatory reasons for terminating Rudwall's employment.  McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); Reid v. Google, Inc., 50 Cal. 4th 512, 520 (2010).[3]  Although Rudwall took issue with BlackRock's assessment of his performance and the

---

[3] It is not clear whether the McDonnell-Douglas test still applies to age discrimination claims under the FEHA in light of the United States Supreme Court's recent decision under the federal Age Discrimination in Employment Act, requiring the plaintiff to prove that his age was the "but

- 3 -

1  value of his contributions to the company, he cannot defeat summary judgment by attacking

2  BlackRock as having arrived at the wrong conclusion about his performance.  An employer only

3  is required to honestly believe the reasons for its actions, even if those reasons are foolish, trivial

4  or baseless - - none of which is the case here.  <u>Horn v. Cushman & Wakefield Western, Inc.</u>, 72

5  Cal. App. 4th 798, 807 (1999) ("Nor can the employee simply show the employer's decision was

6  wrong, mistaken, or unwise"); <u>Guz v. Bechtel Nat'l, Inc.</u>, 24 Cal. 4th 317, 358 (2000) ("If

7  nondiscriminatory, [employer's] true reasons need not necessarily have been wise or correct");

8  <u>Coleman</u>, <i>supra</i>, 232 F.3d at 1285 (an employer's "unwise business judgments" or use of a

9  "faulty evaluation system" does not support an inference of age discrimination.)

10      Rudwall's disparate impact theory fails as he has not provided any evidence that a

11  facially neutral practice or policy of BlackRock, "bearing no manifest relationship to job

12  requirements, in fact had a disproportionate adverse effect on members of the protected class."

13  <u>Guz</u>, <i>supra</i>, 24 Cal. 4th 317.

14      Rudwall cannot prevail as a matter of law on his third claim for relief for breach of the

15  implied covenant of good faith and fair dealing because it is duplicative of his breach of contract

16  claim.  <u>Careau & Co. v. Sec. Pac. Bus. Credit, Inc.</u>, 222 Cal. App. 3d 1371, 1395 (1990).  The

17  fourth claim for quantum meruit for the reasonable value of Rudwall's services in 2008 also fails

18  as a matter of law.  The law does not permit Rudwall to recover under a quantum meruit theory

19  where, as here, he also seeks recovery of damages for breach of his employment contract with

20  BlackRock.  Where there exists an actual contact covering the same subject matter, quantum

21  meruit is unavailable.  <u>See</u>, <i>e.g.</i>, <u>Hedging Concepts v. First Alliance Mortgage Co</u>., 41 Cal. App.

22  4th 1410, 1419 (1996).

23      Finally, Rudwall's allegations and the undisputed facts establish that his fifth cause of

24  action for wrongful termination in violation of public policy is based on the contention that

25  BlackRock terminated him in retaliation for sending a letter to management asking for a

26  $650,000 bonus.  This claim fails as a matter of law because (1) there is no public policy that

27

28  for" cause of the termination of his employment and holding that the burden never shifted to the
employer.  <u>See</u> <u>Gross v. FBL Financial Services</u>, __U.S __129 S. Ct. 2343, 2351 (2009).  The
<u>Gross</u> decision is discussed in more detail later in this brief.

prohibits an employer from terminating an employee because the employee asks for a large

bonus; and (2) the undisputed facts establish that Rudwall already had been included in the initial

draft of the cost reduction plan before the letter was sent to management and there is no evidence

the letter was considered in making the decision.

## II.   SUMMARY OF FACTS

In 1996, at the age of 44,[4] Rudwall became employed as a money market sales

representative in BlackRock's Cash Management, Direct Channel division.  (Rudwall Depo.

41:5-42:10, Declaration of Gurinder Dosanjh, "Dosanjh Dec.," ¶ 3.)  John Moran ("Moran"),

who was 3 years older than Rudwall, acted as Rudwall's supervisor for almost the entire duration

of Rudwall's employment with BlackRock, from 1996 through November 2008.  Moran also

acted as Rudwall's manager at their previous employer, Provident Distributors, from 1993 to

1996.  (Declaration of John Moran, "Moran Dec." ¶¶ 2, 3.)   In his initial years with BlackRock,

Rudwall was paid a base salary plus commission.  BlackRock calculated commissions according

to a formula that was based upon the amount of money market assets under the individual sales

person's management.  Thus, because a sales person's compensation was tied directly to the

amount of those assets, at that time it was critical to maintain accurate information regarding

those assets.  (Moran Dec., ¶ 4.)  During this time frame, Rudwall received favorable

performance reviews.  In written comments by Rudwall made in 1999, he stated that "working

with John [Moran] over the past seven years has been a terrific experience."  (Moran Dec., ¶ 5,

Exh. 80.)

Unfortunately, the relationship between employer and employee deteriorated markedly

after that period of time and Rudwall became increasingly adversarial in his attitude toward

BlackRock.  This correlated to the dramatic changes in both the scope and nature of BlackRock's

business operations.  The company expanded, through acquisitions; diversified its products and

services; consolidated; and upgraded its technology.  In order to successfully integrate other

businesses, technologies and employees into BlackRock, and at the same time ensure the

integrity and consistency of its operations on a global basis, BlackRock developed a new

---

[4] Rudwall alleges his date of birth is February 16, 1952.  (Complaint ¶ 1.)

directive, "One BlackRock," which promoted teamwork among its employees and a consistent approach to client service. BlackRock expected employees to share information regarding clients and educate themselves as to the full complement of services offered by the company. (Moran Dec., ¶ 10.)  As part of the One BlackRock service strategy, Rudwall and all the other sales representatives also were required to use the company's electronic recordkeeping systems, "Avenue" and "Notes," on a consistent basis in order to ensure effective communication across all channels.  (Moran Dec. ¶ 11.)

During this time of fundamental change in the company, BlackRock also modified its compensation policy for its Direct Channel sales force, eventually discontinuing altogether the payment of commissions and instead paying the sales force a base salary plus an annual, discretionary bonus.  This transition in the compensation structure took place from 2003 through 2005 and brought the Direct Channel sales force in line with how employees in other BlackRock divisions were being paid.[5]  (Moran Dec., ¶ 24; Exh. 8.)

BlackRock's management felt that Rudwall never fully embraced the "One BlackRock" concept or the new compensation policy, as evidenced by his repeated complaints about his compensation; his refusal to comply with management's directives; the failure to properly utilize the Avenue system; and Rudwall's uncooperative, disruptive behavior and suing BlackRock for defamation based upon a performance review.  Further, BlackRock considered Rudwall's money market fund asset levels to be disappointing given the extremely rich opportunities presented by the Northern California territory BlackRock had assigned Rudwall.  (Moran Dec., ¶¶ 6-22, 24-27, 29, 32-35, 37-48 and Exhs. 14, 15, 17, 18, 26, 46, 88, 89, 103, 104, 105, 106, 108-110; Declaration of Simon Mendelson, "Mendelson Dec.," ¶¶ 5-9, 15, 18, Exhs. 43, 47; Goodman Dec., ¶ 11, Exh. 24; Rudwall Depo. 273:9-280:2; 288:2-293:1, Exhs. 45, 46 and 47; Deposition of Mark Steinberg, "Steinberg Depo." 13:5-11; 14:3-19, 17:11-20, 35:19-36:25.)

The parties' contentious history is undisputed.  Rudwall testified that BlackRock "had it

---

[5] Also, as clients shifted from direct investments in BlackRock money market funds to the use of "portals" (essentially intermediaries who made the investments on behalf of the clients), it became increasingly difficult to identify the exact amount that many clients had invested in BlackRock and, thus, the exact amount of assets credited to any individual Direct Channel sales representative handling that client.  (Moran Dec., ¶ 25.)

in for him" as early as 1999 because of his demands for additional compensation and because a high-level executive, Barbara Novick, perceived that he was not a team player.  (Rudwall Depo. 114:17-116:2; 118:8-9; 118:8-122:4.)

On December 1, 2000, Rudwall wrote to BlackRock's chairman and C.E.O., Larry Fink, criticizing Ms. Novick for having failed to recognize his efforts in developing a relationship with a client, Cisco.  He went behind his supervisor's, Moran's, back on the letter.  Upon learning of the letter, Moran was very upset and embarrassed.  He informed Rudwall that taking this action behind his  back was unconscionable and mean-spirited; that his letter suggested Rudwall's personal interests outweighed those of the company; and that he found the self-serving nature of Rudwall's conduct undercut the ability of BlackRock's various departments to work together to accomplish the company's joint goals.  (Moran Dec., ¶¶ 13, 14, 15, Exhs. 15, 16.)

In a December 11, 2000 memo to upper level management, Moran said Rudwall "will either become and buy into 'one BlackRock' or I'll be logging extra flight time as we attempt to save assets by replacing Tom."  Moran explained in the memo that he would expand the territories of two existing employees, one of whom, Mr.  Hertzenberg, was more than seven years older than Rudwall, and hire two younger sales types "to fill in the gaps."  (Dosanjh Dec., ¶ 3; Moran Dec., ¶ 18, Exh. 88.)  In a January 17, 2001 email, Moran described the points he intended to address with Rudwall in an upcoming meeting, including complaints from other employees that Rudwall was demanding and at times offensive.  Moran expressed his hope to senior management that Rudwall would "see the light and buy-in to E-mail, Avenue, Notes, Institutional Funds training and the opening of a San Francisco office."  (Moran Dec., ¶ 19; Exh. 89.)

Moran evaluated sales representatives' performance by reviewing the assets in their territory; new business that they had generated; their use of Avenue, Notes and email; their interaction with other members of the Cash Management Group; and their treatment of internal analysts. (Moran Dec., ¶ 23.) In Rudwall's 2001 performance review,  Moran remarked that Rudwall's sales ability remained excellent, but that he wasn't utilizing certain aspects of BlackRock's e-mail and intranet system; management perceived this to be an ongoing problem

throughout his employment.  (Moran Dec., ¶¶ 11,12; Exhs. 18, 106.)

Rudwall's January 2001, December 2003, and September 2004 performance reviews all state that Rudwall "meets some but not all the expectations of his employer" - - the second worst category he could receive.  (Moran Dec., ¶¶ 11, 12, 24, 29, 33; Exhs. 18, 26; Rudwall Depo. 186:2-4; 189:23-190:16, Exhs. 24 and 26; Steinberg Depo. 19:4-24; 20:13-24:5, Exh. 26.)  In the next review, dated December 2004, Rudwall received the lowest possible evaluation, "does not meet expectations."  After that time, the evaluation forms were revised and the "exceeds, meets, does not meet expectations" categories were omitted in favor of narrative comments.  (Moran Dec., ¶¶ 37; Exh. 28; Rudwall Depo. 226:14-227:8; 228:6-230:15.)

In 2003, Rudwall refused to sign an employment policy containing a non-solicitation provision.  (Rudwall Depo. 144:3-146:23; 153:3-22; Exh. 13; Complaint ¶ 8.)  Although the parties reached a compromise and Rudwall signed a modified version of the policy[6], Rudwall continued to bring up this incident in later years, accusing BlackRock of bearing an ongoing grudge against him because he initially wouldn't sign the employment policy.  (Rudwall Depo. 248:18-249:11.)  Rudwall's hostility to BlackRock was such that even when he received a "meets expectations" performance review, he described it as an "egregious slur" upon his "indisputable record of exceptional achievement."  (Moran Dec., ¶ 27; Exh. 23.)

In October 2003, managing director Mark Steinberg ("Steinberg") became employed with BlackRock and joined Moran as co-head of the cash management business, overseeing most aspects of the business including the supervision of the Direct Channel sales force, which included Rudwall.  Steinberg was 53 at the time.  (Moran Dec., ¶ 28; Dosanjh Dec., ¶ 3.)

During 2004, in light of BlackRock's increased sales force and in recognition of the growth and diversification of its product lines, BlackRock reconfigured certain sales territories in order to maximize these resources and seize the opportunity to sell more cash products.  This resulted in Rudwall's sales territory becoming Northern California exclusively.  Previously, Rudwall had been assigned to Northern California, Oregon, Washington, Idaho and Alaska. Given the "dot.com bubble" and explosive growth of companies in the Silicon Valley,

---

[6] Goodman Dec., ¶ 13, Exh. 13

BlackRock's management believed that it would be best for Rudwall to focus his energies in the Northern California area.  (Moran Dec., ¶¶ 30, 31; Exh. 111.)

In September 2004, Steinberg and Moran sent Rudwall a letter outlining concerns about his conduct and stating that "***the measurement of your success is not solely determined by your ability to generate sales***."  (Moran Dec., ¶ 34; Exh. 27, emphasis added; Rudwall Depo. 191:11-25; Steinberg Depo 24:21-26:24, Exh. 27.)  It mentioned that Rudwall's conduct has proven embarrassing to BlackRock; that he had refused to share client information on the basis that it was "confidential" (thereby failing to appreciate that the client was that of BlackRock and not Rudwall's personal client); had failed to maintain accurate records in the Avenue system; and had repeatedly questioned BlackRock's compensation programs.  Rudwall was reminded that it was BlackRock's right to determine the compensation structure for its employees.  The letter called for "immediate and sustained improvement" in his conduct and, failing that, BlackRock "would have no alternative but to take further disciplinary action including dismissal."  Id.

In his next review, dated December 2004, Rudwall received the lowest possible evaluation, "does not meet expectations."  Among numerous examples cited of Rudwall's deficiencies were the "precipitous" decline in Rudwall's face-to-face meetings with clients and the decline in his assets.  Steinberg recommended that Rudwall be fired due to poor performance and attitude.  (Moran Dec., ¶ 37; Exhs. 28, 29, 31.)  Steinberg testified that he had never supervised an employee in his entire career whom he thought "more worthy of being terminated for attitude, performance and related issues."  (Steinberg Depo. 43:14-44:13; 47:6-52:2.)  Rudwall's employment, however, was not terminated.  (Steinberg Depo. 44:1-13.)

Rudwall's adversarial attitude did not change and in 2005 Rudwall received another poor performance evaluation.  (Moran Dec., ¶ 38, Exh. 32; Rudwall Depo. 239:17-240:18.)  In June of that year, Rudwall unlawfully tape recorded a phone call with his managers, Steinberg and Moran, without their knowledge or permission.  Rudwall initially admitted that the phone call had been tape-recorded.  When Moran sent an email to Rudwall requesting a copy of the tape, Rudwall lied and stated the call had not been successfully recorded.  Steinberg refused to manage Rudwall any further and again recommended that his employment be terminated.  (Rudwall

- 9 -

Depo. 199:18-200:1; 202:15-24; Moran Dec., ¶¶ 40, 41; Exh. 35; Steinberg Depo. 60:20-61:11; 62:4-64:4.)  In an effort to repair the employment relationship, Moran sent Rudwall a September 14, 2005 communication that effectively held out an olive branch to Rudwall.  Moran stated that BlackRock wanted to see Rudwall succeed in his position and believed that he had the ability to do so, but that his written communications were contentious in tone and content. Moran mentioned the need for BlackRock to be able to give constructive feedback to its employees and asked that Rudwall consider his 2005 review in that context.  Moran offered to work more closely with Rudwall in the next several months to help improve his performance. Moran concluded the letter by expressing BlackRock's desire to continue their longstanding employment relationship and work together "cooperatively in the future."  This gracious letter offering to move forward was greeted by Rudwall with a 6 page response **in which he demanded that the parties submit to arbitration the issue of whether management's criticism of him in the prior 2005 review had any factual basis.**  (Moran Dec., ¶¶ 42, 43; Exhs. 37, 38.)

Rudwall's conduct compelled BlackRock to assign him his own personal supervisor.  By December 2005, Rudwall was notified that Steinberg would no longer supervise him and that Moran would be his only supervisor.  Steinberg later assumed sole responsibility for managing the entire approximately 13 to 14 member Direct Channel sales force  and  Moran's responsibilities no longer included a supervisory role.  Nevertheless, in a continuing effort to repair the employment relationship with Rudwall, BlackRock requested Moran alone supervise Rudwall.  (Rudwall Depo. 34:14-38:3; 40:11-41:4; Moran Dec., ¶¶ 42, 44.)

In 2006, Rudwall sued BlackRock for defamation and emotional distress based upon some statements made by Steinberg and Moran in Rudwall's 2005 performance review.  Judge Marilyn Patel granted BlackRock's motion for judgment on the pleadings on November 30, 2006, which the Ninth Circuit Court of Appeals affirmed on appeal effective September 4, 2008. (Moran Dec., ¶ 45; Goodman Dec., ¶¶ 8-10, Exhs. 122-124.)

In Rudwall's last performance evaluation, dated November 2007, Moran noted that Rudwall ranked 10th out of 14 in face-to-face meetings with clients; 6th out of 14 in new

DEFENDANT BLACKROCK, INC.'S NOTICE OF MOTION AND  MOTION FOR PARTIAL SUMMARY JUDGMENT – CASE NO. CV 09-05176 (TEH)

business; and that his assets were disappointing in light of the "depth of opportunities" in his region and his experience in the industry. Moran considered this to be a negative review, as did Rudwall. (Rudwall Depo, 273:9-21; Moran Dec. ¶ 47, Exh. 45.)  The evaluation also mentions Rudwall's continued failure to properly use the Avenue system and the expectation that Rudwall be more effective in dealing with other members of the Cash Management team.  (Moran Dec., ¶ 47; Exh. 45.)

The decision to include Rudwall in the November 2008 RIF primarily was made by Mendelson, an individual who at the time held the position of Chief Operating Officer of BlackRock's Cash Management Group ("CMG.")  (Mendelson Dec., ¶¶ 2, 10, 14, 15.)  For over one year prior to the RIF, Mendelson had email exchanges, telephone conversations, and face-to-face meetings with Rudwall.[7]  (Mendelson Dec. ¶¶ 4-7; Rudwall Depo. 27:9-13; 104:6-17; 269:15-270:14.)  In 2007, Mendelson monitored Rudwall's performance, including being consulted by Moran as to the unfavorable 2007 performance review.  He also reviewed a number of reports provided by Steinberg identifying the average asset levels of the entire Direct Channel sales force.  During this time period, Mendelson advised Rudwall that BlackRock expected him to have a much higher asset level based upon the fertile territory assigned to Rudwall. (Mendelson Dec., ¶¶ 8, 9, 12; Moran Dec., ¶ 47, Exh. 45; Rudwall Depo. 285:7-18.)

In October 2008, BlackRock's senior management requested that Mendelson prepare a proposal for a cost reduction plan in response to the global economic crisis.  In November 2008, BlackRock implemented a RIF as part of its cost reduction plan.  In order to determine which employees to propose for inclusion in the RIF, Mendelson undertook an evaluation of the sales force and received feedback from certain managers as to the relative performance of the staff. This included Steinberg's input of who were the worst performers.  Steinberg informed

---

[7] The communications exchanged between Mendelson and Rudwall in 2007 and 2008 included Mendelson's admonishment to Rudwall "to spare us the Tom is great editorial you provide with each email.  To tell you the truth, the client oriented action you took is standard practice I would expect of all our salespeople."  (Mendelson Dec., ¶ 6; Exh. 44.)  Rudwall also directed complaints to Mendelson about Moran, calling into question his business decisions and criticizing Moran for not providing, in response to Rudwall's repeated demands, specific information as to the "value given each factor" BlackRock considered in determining his bonus. (Mendelson Dec., ¶ 7; Exh. 43.)

- 11 -

Mendelson that Rudwall was among the worst performers.  (Mendelson Dec., ¶¶ 10, 13; Exhs. 92, 93; Steinberg Depo., 66:12-69:3.)

Mendelson took into consideration the relative strength of the employees' performance for the company; Rudwall's reluctance to accept the One BlackRock core philosophy; the difficulty managing  Rudwall; Steinberg's recommendations; and Mendelson's personal observations of Rudwall.  Based upon these considerations, he decided to include Rudwall in the RIF.  Rudwall's name appeared in the very first draft of the cost reduction plan in October 2008.  (Mendelson Dec., ¶¶ 3- 9, 11-16, Exh. 93.)  Mendelson did not consider age as a factor in making his decision.  (Mendelson Dec., ¶ 17.)

Immediately before the November 2008 RIF, there were 14 sales representatives and managers working in the Direct Channel sales force.  All of them were over the age of 40.  Following the RIF, among the Direct Channel employees retained by BlackRock were employees who were 62, 59, 55 and 54 years of age, respectively.  As of the date of the filing of this motion, BlackRock had not hired any new employee to replace Rudwall.  (Steinberg Depo. 72:10-19, 104:17-21; Mendelson Dec., ¶¶ 11, 14, Exh. 55; Moran Dec., ¶ 49; Dosanjh Dec. ¶3.)

## III.   LEGAL ARGUMENT

### A.   RUDWALL'S AGE DISCRIMINATION CLAIM

#### 1.   Under Guz and McDonnell Douglas, Rudwall Cannot Establish a Prima Facie Case of Age Discrimination Based on Disparate Treatment

Rudwall sues for age discrimination in violation of FEHA.  As pertinent, this statute provides that "[i]t shall be an unlawful employment practice . . . for an employer, **because of** the . . . age . . . of any person to . . . discharge the person from employment . . . ."  Cal. Govt. Code § 12940(a), emphasis added.  A claim for age discrimination under FEHA based upon a disparate treatment theory requires the plaintiff to prove "intentional discrimination" against him on prohibited grounds.  Guz, *supra*, 24 Cal. 4th at 354.

The courts have traditionally analyzed age claims under a three-step, burden shifting "McDonnell Douglas" test to determine if discrimination could reasonably be inferred from the facts and not otherwise satisfactorily explained by the employer.  McDonnell Douglas, *supra*,

411 U.S. 792.  Under that test, the plaintiff must establish a *prima facie* case showing "actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on a prohibited discriminatory criterion."  Guz, *supra*, 24 Cal. 4th at 355, internal citation and quotation marks omitted.  If the plaintiff meets his burden, there is a presumption of discrimination and the burden shifts to the employer to produce evidence that the adverse action was taken for a legitimate, non-discriminatory reason.  A reason is "legitimate" if it is "facially unrelated to prohibited bias, and which if true, would thus preclude a finding of discrimination."  Reid, *supra*, 50 Cal. 4th at 520.  If the employer meets this burden, then the presumption in favor of the employee disappears and the employee must show that the employer's reasons are pretexts for discrimination, or produce other evidence of intentional discrimination.  Ibid.  The plaintiff is required to produce specific "substantial evidence" that the employer's reason for its action was untrue or pretextual and/or that the employer acted with a discriminatory animus, "such that a reasonable trier of fact could conclude the employer engaged in intentional discrimination."  Hersant v. Department of Social Services, 57 Cal. App. 4th 997, 1004-05 (1997); Wallis v. J.R. Simplot, 26 F.3d 885, 890-891 (9th Cir. 1994).  Here, Rudwall cannot meet this burden with evidence sufficient to withstand a motion for summary judgment of his age discrimination claim.

First, Rudwall has no direct evidence demonstrating it was "more likely than not," his employment was terminated based upon his age.  In discovery, Rudwall produced no evidence showing that Simon Mendelson, the individual primarily responsible for the decision to include Rudwall in the RIF ever considered age in his decision.  Rudwall further produced no evidence that Mendelson ever made any age-related comments about Rudwall or others or that he considered his age in making the decision to include Rudwall in the RIF. ."  (Goodman Dec., Exh. 121, Rudwall's Response to Interrogatory Nos. 4 and 6.)

Instead, BlackRock anticipates Rudwall will attempt to rely in his opposition upon two emails in 2000 and 2001, seven to eight years *before* his termination, in which his manager, John Moran, mentioned hiring "young people" to "fill in the gaps."  (Goodman Dec., Exh. 121, Rudwall's Response to Interrogatory Nos. 4 and 6; Moran Dec., ¶¶ 18, 19 and Exhs. 88 and 89.)

1   In context, it is clear that the emails revealed no age-related discriminatory animus against

2   Rudwall; rather, in the emails Moran explains to upper management an approach of expanding

3   other salesperson's territories, one of whom was seven years *older* than Rudwall, as well as

4   hiring new employees in the event he cannot correct Rudwall's inappropriate behavior.  In fact,

5   however, Moran continued to work with Rudwall, continually attempting to correct and re-direct

6   his behavior for the next 7-8 years.

7          These emails, generated 7 and 8 years prior to the termination of Rudwall's employment,

8   and by someone other than the primary decision-maker, cannot as a matter of law support his age

9   discrimination claim as the passage of time demonstrates that they were not related to the

10   decision to terminate Rudwall's employment.  See Nidds v. Schindler Elevator Corp., 113 F.3d

11   912, 918-919 (9th Cir. 1996) (manager's comment that he intended to get rid of all the "old

12   timers" made two to three years before the plaintiff's layoff not enough to support an inference

13   of age discrimination as not tied directly to the plaintiff's layoff); Allen v. Pacific Bell, 212 F.

14   Supp. 2d 1180, 1188-1199 (C.D. Cal. 2002) (defendant's statements that it was hiring younger

15   service technicians because they "were cheaper" did not constitute direct evidence of age

16   discrimination because the comments were not uttered close in time to the decision not to return

17   Plaintiff to his position); and Reid, *supra*, 50 Cal. 4th at 541 (court should consider when the

18   offending comments were made in relation to the adverse employment decision and their

19   context).

20          The California Supreme Court recently evaluated the stray remarks doctrine[8] and found it

21   a matter of "common sense" that remarks regarding a person's age, race, gender, etc., do not, in

22   and of themselves, prove actionable discrimination.  Reid, *supra*, 50 Cal. 4th at 541.  Instead,

23   there must be other evidence of pretext in order to defeat summary judgment in favor of the

24   employer.  Id. at 542.  The Reid Court adopted a "totality of circumstances" approach to

25   "successfully winnow[] out cases 'too weak to raise a rational inference that discrimination

26   occurred.'"  Id. at 541, citing Guz, *supra*, 24 Cal. 4th at 362 (court may grant summary judgment

27

28   [8] The stray remarks doctrine refers to statements by non-decision-makers outside of the
   decisional process.

- 14 -

where "the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.")  In adopting this approach, the <u>Reid</u> Court held that whether derogatory, age-related remarks are sufficient to avoid summary judgment for the employer requires one to evaluate "who made the comments, when they were made in relation to the adverse employment decision, and in what context they were made . . . ."  <u>Id</u>. at 541.  (Emphasis added.)  Here, the comments were made 7 to 8 years prior to the termination of Rudwall's employment and there is no evidence that the statements in the 2000 and 2001 emails were considered by Mr. Mendelson, the individual who decided to include Rudwall in the RIF.

Nor does Rudwall have circumstantial evidence of intentional discrimination.  In discovery Rudwall pointed to BlackRock's hiring of some sales representatives in 2004, whose ages ranged from 37 to 43 years of age at the time, and contends that the hiring of these individuals demonstrate that BlackRock discriminated against Rudwall over 4 years later, in November 2008, by including him in the RIF.  (Goodman Dec., Exh. 121, Rudwall's Response to Interrogatory No. 4.)  This 2004 event is too remote in time to establish discriminatory intent.  Further, the primary decisionmaker for the RIF, Mendelson, was not even employed by BlackRock at the time and thus was not involved in the 2004 hiring decisions.  (Mendelson Dec. ¶ 2.)

Finally, Rudwall also points to BlackRock's inclusion of four individuals in the RIF (Herb Hassell, age 63; Tom Owston, age 58; Rudwall, age 56; and Andy Campanella, age 47) as demonstrating BlackRock discriminated against Rudwall on the basis of age.  (Goodman Dec., Exh. 121, Rudwall's Response to Interrogatory No. 4.)  It is undisputed, however, that among the employees BlackRock *retained* were those aged 62, 59, 55 and 54 -- either older or about the same age as Rudwall.  Moreover, BlackRock never replaced Rudwall following the RIF and never hired any sales person in the CMG after the RIF in November 2008.  (Dosanjh Dec., ¶¶ 3-4; Moran Dec., ¶ 49.)  In addition, of the individuals included in the RIF, Mr. Hassell, already had announced his retirement at the time.  In order to save someone else's job, BlackRock consulted him as to whether he would object to being included in the RIF and he said he would

DEFENDANT BLACKROCK, INC.'S NOTICE OF MOTION AND  MOTION FOR PARTIAL SUMMARY JUDGMENT – CASE NO. CV 09-05176 (TEH)

not.  (Mendelson Depo., 80:16-81:12.)  Finally, Rudwall's cannot rely on the termination of the 47 year old Mr. Campanella to evidence age discrimination while at the same arguing that Mr. Campanella's *hiring* by BlackRock at the age of 43 in 2004 also was evidence of age discrimination.  (Goodman Dec., Exh. 121, Rudwall's Response to Interrogatory No. 4.)

In summary, Rudwall cannot establish a *prima facie* case of age discrimination as he cannot demonstrate that Rudwall's age "actually played a role in [BlackRock's decisionmaking] process and had a determinative influence on the outcome."  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 141 (2000).

### 2.   BlackRock's Reasons for Terminating Rudwall's Employment Were Unrelated to His Age

Assuming a *prima facie* case were established, Rudwall still cannot avoid summary judgment under the McDonnell Douglas test because BlackRock had legitimate, non-discriminatory reasons to terminate his employment based upon the deficiencies in his performance, as corroborated by years of poor reviews.  There is no evidence that the BlackRock RIF - - which was in response to  the global financial crisis - - was implemented as a means to eliminate the jobs of older workers, including that of Rudwall.  BlackRock's business decision to implement an expense reduction plan, including a reduction in its workforce, constituted a permissible, non-discriminatory reason to terminate Rudwall's employment.  Coleman, *supra*, 232 F.3d at 1282.

The evidence supporting BlackRock's legitimate, non-discriminatory reasons for including Rudwall in the RIF is overwhelming.  The parties had a tumultuous employment history marked by Rudwall's adversarial attitude and conduct toward his employer.  It is undisputed that Rudwall sued BlackRock for defamation over a performance review; illegally taped a phone call[9] with his managers at BlackRock; repeatedly challenged and undermined management's policies and procedures; and refused to accept BlackRock's change in compensation structure.  BlackRock properly perceived Rudwall to be extremely difficult to

---

[9]   See Cal. Penal Code §§ 631, 632.

DEFENDANT BLACKROCK, INC.'S NOTICE OF MOTION AND  MOTION
FOR PARTIAL SUMMARY JUDGMENT – CASE NO. CV 09-05176 (TEH)

1  manage and its prior attempts to repair the parties' employment relationship had proven

2  unsuccessful.

3          BlackRock's other non-discriminatory reasons for including Rudwall in the RIF was its

4  disappointment in his asset levels, notwithstanding Rudwall's contention that they were in excess

5  of $7 billion for 2008.[10]  The sales territory BlackRock had assigned to Rudwall included the

6  Silicon Valley.  In BlackRock's opinion, this area represented a great opportunity for cash

7  investments and as a result, Rudwall's asset level should have been higher.  In addition,

8  BlackRock believed that Rudwall was not cooperating with the other salespersons and

9  management by regularly using the Avenue and Notes recordkeeping systems.

10         Despite Rudwall's perception of himself as a "star" employee at BlackRock who claims

11 he merited payment of a $650,000 discretionary bonus for his work in 2008,[11] the law recognizes

12 that BlackRock had the right to select its own criteria for evaluating its employees' performance

13 and Rudwall's subjective personal judgments of his competence cannot raise a genuine issue of

14 material fact.  See Guz, supra, 24 Cal. 4th at 358-59 (in a discrimination claim, the relevant

15 inquiry is not the employee's self-assessment of his performance, but the employer's perception,

16 i.e., whether the employer "honestly believed the stated reasons" for its employment decisions");

17 Bradley v. Harcourt, Brace & Co., 104 F.3d 267, 270 (1996) ("an employee's subjective personal

18 judgments of [his] competence alone do not raise a genuine issue of material fact").

19         As a general proposition, courts do not sit as "super-personnel departments" to reexamine

20 or second-guess an entity's business decisions.  Farnham v. Superior Court, 60 Cal. App. 4th 69,

21 78 (1997); Hanebrink v. Brown Shoe Co., 110 F.3d 644, 646 (8th Cir. Mo. 1997) ("This court. . .

22 may not second-guess an employer's personnel decisions . . . .")  Thus, an employee cannot

23 create an inference of discriminatory animus by contending the employer's decision was "wrong,

24 mistaken, or unwise."  Horn, supra, 72 Cal. App. 4th at 807; Coleman, supra, 232 F.3d 1271,

25 1285.

26

27 [10] Rudwall stated in interrogatories that his asset levels were $8.5 billion in 2008.  (Complaint ¶ 13.)  Although this does not comport with BlackRock's asset reports, even accepting Rudwall's figures, this does not place him at the top for asset levels among his peers.

28 [11] Mendelson Dec., ¶ 18, Exh. 47.

- 17 -

In <u>Reeves</u>, *supra*, 530 U.S. at 148, the Supreme Court held that an employer would be entitled to judgment as a matter of law where "the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred."  This is the case here.  Rudwall has done nothing to create an issue of fact as to whether BlackRock's reasons for including him in the RIF were untrue.

### 3. Impact of Gross Decision Upon Plaintiff's Burden of Proof  in Disparate Treatment Claim

In 2009, the U.S. Supreme Court held that liability is imposed against the employer in an age discrimination claim brought under the Age Discrimination in Employment Act ("ADEA") only where the plaintiff can show that age *alone* was the determining factor in the adverse employment action.  The Court found it irrelevant that age might have been one factor motivating the employer.  <u>Gross</u>, *supra*, 129 S. Ct. at 2348-2350.  Although the Gross court addressed an ADEA claim, California courts look to the federal courts' interpretation of the ADEA in applying FEHA because of their similar statutory language and objectives.  <u>Wynn v. NBC</u>, 234 F. Supp. 2d 1067, 1093 (C.D. Cal. 2002); <u>Guz</u>, *supra*, 24 Cal. 4th at 354.

In <u>Gross</u>, the Court rejected the <u>McDonnell Douglas</u> analysis for age discrimination cases, making it clear that the "burden of persuasion does not shift to the employer to show that it would have taken the action regardless of age, even when a plaintiff has produced some evidence that age was one motivating factor in that decision."  <u>Gross</u>, *supra*, 129 S. Ct. at 2352. The Court based its decision on the plain meaning of the language used in the ADEA (making it unlawful for an employer, *inter alia*, to discharge an employee "because of such individual's age").  In doing so, the Court distinguished the language used in Title VII, which prohibits discrimination based upon other criteria such as race.  Congress amended Title VII to specify that it is sufficient to establish an unlawful employment practice if the employee's protected trait was a motivating factor.

Because California courts consistently have looked to the federal courts for guidance in interpreting FEHA and  the ADEA and FEHA contain the same relevant "because of" language,

- 18 -

DEFENDANT BLACKROCK, INC.'S NOTICE OF MOTION AND  MOTION FOR PARTIAL SUMMARY JUDGMENT – CASE NO. CV 09-05176 (TEH)

BlackRock contends this Court should require Rudwall to meet the higher <u>Gross</u> standard, which would require Rudwall to proffer evidence that "but for" his age, BlackRock would not have terminated his employment.  As discussed above, however, regardless of whether <u>Gross</u> or <u>McDonnell-Douglas</u> applies, Rudwall's age discrimination claim cannot survive summary judgment in this case.

### 4. **Rudwall's Disparate Impact Theory Also Fails**

In order to prevail on a disparate impact claim, a plaintiff must prove that a challenged employment policy or practice, while facially neutral, has a disparate impact on certain employees "because of their membership in a protected group."  <u>Katz v. Regents of the University of California</u>, 229 F.3d 831, 835 (9th Cir. 2000).

Rudwall has not satisfied his burden.  He has not identified a specific employment practice or policy at issue, other than the RIF itself.  Nor has he offered evidence that any practice or policy had a disparate impact on employees ages 40 and older.  In interrogatory responses, Rudwall identified no facts in support of a disparate impact claim.  (Goodman Dec., Exh. 121, Rudwall's Response to Interrogatory No. 4.)  Instead, he addressed only disparate treatment allegations.  Rudwall also referred to, without analysis, BlackRock's lists of the ages and job titles of the employees who were laid off and those who were retained.  (Goodman Dec., Exh. 121, Rudwall's Response to Interrogatory No. 6.)  However, the fact that the reduction in force occurred is not evidence of disparate impact.  Rudwall's factually devoid interrogatory responses cannot defeat summary judgment. See <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 106 S. Ct. 2548, 2553 (1986).

Rudwall's complaint alleges that BlackRock employed approximately 205 Vice Presidents in the Account Management Group and laid off 14 Vice Presidents, including Rudwall; the average age of the 14 terminated Vice Presidents was 41.928 years (42 years); and the average age of the 191 Vice Presidents who were not laid off was 37.727 years (38 years).  (Complaint ¶ 21.)  To defeat summary judgment, Rudwall must show specific facts and cannot rely upon the allegations in the pleadings.  See FRCP Rule 56(e)(2); <u>Brinson v. Linda Rose Joint Venture</u>, 53 F.3d 1044, 1049 (9th Cir. 1995).

1    Assuming, *arguendo*, that the allegations constitute admissible opposition evidence,

2    Rudwall fails to introduce any sufficiently substantial disparity.  First, the mere fact that the

3    majority of employees selected for layoff are in the protected group is not evidence of disparate

4    impact.  Carter v. CB Richard Ellis, Inc., 122 Cal. App. 4th 1313, 1326 (2005); see also Rose v.

5    Wells Fargo & Co., 902 F.2d 1417, 1424 (9th Cir. 1990) Beale v. GTE California, 999 F.Supp.

6    1312, 1323 (C.D. Cal. 1996) (no *prima facie* showing of disparate impact, even though older

7    persons terminated at higher rate than younger persons).

8    Second, the point of the statistical evidence is to establish whether a  specific

9    employment action impacted members of a protected group more than non-members.  Beale,

10   *supra*, 999 F.Supp. at 1323.  This comparison requires evidence regarding the composition of all

11   of the employees who were subject to the same employment action -- not just the department to

12   which the plaintiff belonged.  Ibid.; Carter, *supra*, 122 Cal. App. 4th at 1325-1326.  Rudwall

13   fails to address the entire population but relies solely on the composition of the Account

14   Management Group Vice Presidents.  Rudwall, therefore, has not proffered any relevant,

15   substantially significant statistical evidence.

16   Third, "an important statistic to consider in the RIF context is the difference in the

17   percentage of older employees in the work force before and after the RIF."  E.E.O.C. v.

18   McDonnell Douglas Corp., 191 F.3d 948, 952 (8th Cir. 1999); Rose, *supra*, 902 F.2d at 1423,

19   1425 (Ninth Circuit examined the average age of employees before and after reorganization).

20   Rudwall has not proffered any evidence of the percentage of older workers employed before and

21   after the layoff.

22   Fourth, assuming *arguendo*, that Rudwall's purported evidence, the average age of the 14

23   terminated Vice Presidents (42 years old) and the average age of the 191 Vice Presidents who

24   were retained (38 years old), is a proper basis for comparison, it is not statistically substantial.  A

25   mere four year difference in age between those two groups is insufficient to raise an inference of

26   disparate impact based on age.[12]

27   ───────────────────────
     [12]   In the disparate impact context under FEHA, BlackRock did not find published case law

28   addressing the average ages of groups selected for layoff and those who were retained.  In
     disparate treatment claims, in addressing the issue of whether a plaintiff was replaced by a

- 20 -

1    Accordingly, Rudwall cannot establish a *prima facie* case of disparate impact age

2 discrimination to support his first claim for relief.

3    **B.    Rudwall's Third Claim for Relief for "Breach of Contract Covenant of Good**

4         **Faith and Fair Dealing" is Without Merit**

5    Rudwall alleges that BlackRock breached a 2005 Compensation Agreement that was

6 partly written, partly oral and partly implied, by failing to pay him bonus compensation for work

7 performed in 2008.[13]  Rudwall also sues for breach of the implied covenant, stating that

8 BlackRock included Rudwall in the RIF "in order to deprive him of the bonus to which he was

9 entitled" under the parties' contract.

10    Rudwall cannot proceed with his contractual implied covenant claim as a matter of law.

11 Both federal and state courts are in accord:  such claims are duplicative of those for breach of the

12 employment agreement and therefore improper.  See Careau, *supra*, 222 Cal. App. 3d at 1395

13 ("If the allegations do not go beyond the statement of a mere contract breach and, relying on the

14 same alleged acts, simply seek the same damages or other relief already claimed in a companion

15 contract cause of action, they may be disregarded as superfluous as no additional claim is

16 actually stated"); Diaz v. Federal Express Corp., 373 F. Supp. 2d 1034, 1066 (C.D. Cal. 2005)

17 (Summary judgment granted because breach of implied covenant claim was duplicative of

18 breach of contract claim).

19    Here, Rudwall's breach of the good faith covenant seeks the same relief as his claim for

20 breach of contract and thus should be dismissed as a matter of law.

21    **C.    Quantum Meruit Claim**

22    Rudwall's quantum meruit claim alleges that BlackRock failed to reasonably compensate

23 him for services performed in 2008.  At the same time, as described above, he contends that he

24 had an employment contract in place with BlackRock and that BlackRock breached that contract

25 by not paying him the amount owed for services performed in 2008.  "A quantum meruit or

26

27 "significantly younger" person, some courts have held that any gap less than 10 years is
presumptively insignificant, putting the burden on the plaintiff to produce evidence that the
employer considered the age gap significant.  See Guz, *supra*, 24 Cal. 4th at 367.

28 [13] BlackRock has not moved for summary judgment on Rudwall's contract claim.

- 21 -

quasi-contractual recovery rests upon the equitable theory that a contract to pay for services rendered is implied by law for reasons of justice.  However, it is well settled that there is no equitable basis for an implied-in-law promise to pay reasonable value when the parties have an actual agreement covering compensation."  Hedging Concepts v. First Alliance Mortgage Co., *supra*, 41 Cal. App. 4th at 1419, internal citations and quotation marks omitted.

Here, as in Hedging Concepts, Rudwall contends that the parties had an actual compensation agreement in place under which he was to be paid.  This consisted of a base salary and a discretionary bonus.  "When parties have an actual contract covering a subject, a court cannot- - not even under the guise of equity jurisprudence - - substitute the court's own concepts of fairness regarding that subject in place of the parties' own contract."  Hedging Concepts, *supra*, 41 Cal. App. 4th at 1420.

### D.   **Rudwall's Fifth Claim for Wrongful Termination in Violation of Public Policy Claim Has No Merit**

Rudwall alleges that BlackRock terminated his employment in retaliation for (1) his efforts to negotiate the terms and conditions of his employment, including the amount of bonus paid to him, and (2) hiring an attorney to assist him with negotiation regarding the conditions of his employment.  (Complaint, p.11, ¶¶ 13, 43.)

First, even if BlackRock *had* terminated Rudwall in response to his request for a bonus, such conduct would not violate any protected, fundamental public policy.  In order for an employer to be liable for the tort of wrongful termination in violation of public policy, the employer's conduct must violate a public policy that is fundamental, well established and "carefully tethered" to a constitutional or statutory provision.  Carter v. Escondido Union High School Dist., 148 Cal. App. 4th 922, 925; 56 Cal. Rptr. 3d 262 (2007).

Rudwall's demand that BlackRock exercise its discretion and award him a larger bonus is not a protected, fundamental public policy:  "The tort of wrongful discharge is not a vehicle for enforcement of an employer's internal policies or the provisions of its agreements with others." Turner v. Anheuser-Busch, Inc., 7 Cal. 4th 1238, 1257 (1994) (plaintiff's complaint that his supervisor violated internal policies regarding wages and other provisions did not implicate a

1  fundamental public policy).

2      Second, Rudwall contends his employment was terminated in response to a

3  November 17, 2008  letter he sent to Mendelson, among others, requesting a $650,000 bonus.

4  (Goodman Dec., Exh. 121; Rudwall's Response to Interrogatory No. 17 , Complaint, ¶¶ 13, 43;

5  (Mendelson Dec., ¶ 18, Exh. 47).  There is, however, no evidence that BlackRock terminated

6  Rudwall's employment for the reasons he alleges.  It is undisputed that the RIF was implemented

7  in response to the global financial crisis.  As described more fully above, the decision to include

8  Rudwall in the RIF was based upon a long history of performance issues BlackRock had with

9  Rudwall, which was well-documented in his written performance reviews.  As a result,

10  Rudwall's name already appeared on BlackRock's cost reduction plan in October 2008.

11  (Mendelson Dec., ¶ 13, Exh. 93 at p. 4.)  Thus, Rudwall's later November 7, 2008 letter had no

12  bearing upon BlackRock's employment decision and Rudwall proffers no evidence that the

13  November 7, 2008 letter was ever considered in the decision to include Rudwall in the RIF.

14  Finally, the letter does not refer to any retention of an attorney by BlackRock to assist him in

15  negotiating his compensation and Rudwall has not identified any attorney who allegedly

16  negotiated with BlackRock regarding his 2008 compensation.  (Mendelson Dec., ¶ 18, Exh. 47).

17      Rudwall's public policy claim therefore fails as a matter of law.

18  **IV.    <u>CONCLUSION</u>**

19      Blackrock reduced its workforce in response to the global financial crisis and included

20  Rudwall because of his performance record and his poor attitude.  Based upon the undisputed

21  facts, BlackRock, Inc. is entitled to partial summary judgment on Plaintiff's first, third, fourth,

22  and fifth claims for relief.

23  DATED:  January 3, 2011              EPSTEIN BECKER & GREEN, P.C.

24

25                          By:    /s/  James A. Goodman
                                James A. Goodman
26                              J. Susan Graham

27                              Attorneys for Defendant
                                BLACKROCK, INC.

28

- 23 -