1   IN THE UNITED STATES DISTRICT COURT

2   FOR THE NORTHERN DISTRICT OF CALIFORNIA

3

4

5   THOMAS H. RUDWALL,

6                          Plaintiff,              NO. C09-5176TEH

7              v.                                   ORDER RE: MOTION FOR
                                                    SUMMARY JUDGMENT
8   BLACKROCK, INC.,

9                          Defendants.

10

11       This matter came before the Court on February 7, 2011, on Defendant's motion for

12   summary judgment. For the reasons set forth below, Defendants' motion is GRANTED IN

13   PART and DENIED IN PART.

14

15   **BACKGROUND**

16       Plaintiff Thomas Rudwall ("Rudwall") became a salesman for Provident Advisors in

17   1993, when he was about 40 years old.[1] Rudwall Decl. ¶¶3-4. As a member of the Direct

18   Channel Money Fund Sales Force ("Money Fund"), he sold money market funds to

19   institutional investors. *Id.* at ¶¶3-4, 21. Defendant BlackRock, Inc. ("BlackRock"), acquired

20   Provident Advisors in late 1996. *Id.* at ¶6.

21       BlackRock terminated Rudwall in November 2008, when he was 56 years old. *Id.* at

22   ¶29. Though BlackRock's revenues were on the rise, its net income had dropped by 20

23   percent between 2007 and 2008, from $1,077 million to $856 million. McGuinn Decl. Ex. I

24   (BlackRock Annual Report 2009). The letter from human resources notifying Rudwall of his

25   termination stated that Rudwall's position was eliminated "as part of a cost reduction

26   program resulting from recent extraordinary events in the financial markets." McGuinn Decl.

27   _____

28       [1] Rudwall's birthday is February 16, 1952. Rudwall Decl. ¶1.

United States District Court

For the Northern District of California

Ex N. BlackRock paid Rudwall a prorated salary of $110,000 for his work in 2008. Rudwall Decl. ¶30. BlackRock did not pay Rudwall a bonus for that year. *Id.*

Nearly 4,000 BlackRock employees were included in the reduction-in-force that led to Rudwall's termination in November 2008. Lepowsky Decl. ¶6. The Money Fund terminations were overseen by Simon Mendelson ("Mendelson"), chief operating officer of the cash management group, who was asked by senior management in October 2008 to cut costs in his department, which included the Money Fund, by 10 percent. Mendelson Decl. ¶¶10-11. At the time, the Money Fund included fourteen salespeople, including Rudwall. Rudwall Decl. ¶26. All of them were over the age of 40. Lepowsky Decl. ¶6.

Mendelson determined that a reduction-in-force would be required to realize the mandated savings. Mendelson Decl. ¶10. Mendelson sought to select the weakest Money Fund performers for termination.[2] Mendelson Decl. ¶¶11-15; McGuinn Decl. Ex. C (Mendelson Depo. at 105:10-11). Rudwall stood out to Mendelson as a candidate for

---

[2] In a document labeled, "Objections to Evidence," and presented to the Court at the hearing on February 7, 2011, Rudwall objected to several paragraphs in Mendelson's declaration. These evidentiary objections are untimely. Local Rule 7-3 provides that "[a]ny evidentiary and procedural objections to the motion must be contained within the brief or memorandum" filed in opposition to the motion. Rudwall did not include his evidentiary objections in his opposition papers, and the evidentiary objections are therefore untimely. However, even if the objections were timely made, they fail to persuade the Court. Rudwall objects to two paragraphs in Mendelson's declaration: (1) Paragraph 9, in which Rudwall states that he agreed with John Moran, another supervisor, that Rudwall's performance was disappointing in light of Rudwall's experience and the opportunities for sales in the Silicon Valley; and (2) Paragraph 15, in which Mendelson further explains his perception of Rudwall's performance. With no analysis, Rudwall objects to both of these paragraphs as improper lay opinion under Rule 701(a) of the Federal Rules of Civil Procedure and statements made without personal knowledge under Rule 602 of the Federal Rules of Civil Procedure. Rule 701(a) allows lay witnesses to testify about opinions or inferences only if they are rationally based upon the witness's own perceptions. Rudwall does not explain why Mendelson's managerial duties fail to give rise to the perceptions that inform the opinions in his declaration. Rule 602 requires a witness to testify to matters only if evidence supports a finding that the witness has personal knowledge of the matter. Elsewhere in Mendelson's declaration he chronicles his experience working with Rudwall and evaluating Rudwall's performance. Rudwall fails to persuade the Court that Mendelson's opinion is based upon anything other than his own personal knowledge. He need not be an expert to have a personal opinion as to the performance of an employee and the potential for sales in that employee's territory.

termination. One reason was Rudwall's lackluster performance review in December 2007.[3] *Id.* at ¶8. The review noted that (1) Rudwall's average asset balance had declined by 8.5 percent, putting him tenth among the fourteen Money Fund salespeople; (2) Rudwall was tenth among the Money Fund salespeople in face-to-face meetings with clients; (3) Rudwall was sixth among his team in generating new business; (4) Rudwall continued to resist using the sales team's computer system; and (5) Rudwall needed to do a better job of working within BlackRock's team-based sales approach. *Id.* Mendelson also thought that Rudwall was difficult to manage. *Id.* at ¶¶12, 15. Mendelson viewed Rudwall's repeated demands for increased compensation and repeated questions regarding the amount of his discretionary bonus to be "unmerited and time consuming." *Id.* at ¶7. In January 2008, Rudwall appealed to Mendelson regarding a decision made by Rudwall's supervisor, John Moran ("Moran"), who had attempted to resolve a conflict that arose when Rudwall and another salesperson claimed the same client. *Id.* at ¶5. To resolve the issue, Moran had assigned Rudwall the client's domestic sales and the other salesperson the client's international sales. *Id.* Rudwall described Moran's decision as "beyond the pale" and demanded that Mendelson reverse it. *Id.* Mendelson refused to reverse Moran's decision and believed it was inappropriate for Rudwall to challenge his supervisor's decision in this way. *Id.* Mendelson also believed that Rudwall sought praise from management for performing routine tasks. *Id.* at ¶6. In February 2008, Rudwall e-mailed Mendelson explaining that his "grace in responding" to a client "saves us for another day." *Id.* Mendelson responded: "Thanks for the update – but you really can spare the 'why Tom Rudwall is great' editorial you provide with each email. To tell you the truth, the client oriented action you took is standard practice I would expect of all our salespeople." *Id.* at Ex. 44.

    In deciding who to terminate among the Money Fund salespeople, Mendelson consulted with Moran and Mark Steinberg ("Steinberg"), co-managers of the Money Fund sales force. Mendelson Decl. ¶¶3, 11-13; McGuinn Decl. Ex. C (Mendelson Depo. at 104:6).

_____

[3] Rudwall does not challenge the admissibility of his performance evaluations, which are before the Court in an exhibit to Rudwall's counsel's declaration.

United States District Court

For the Northern District of California

Steinberg informed Mendelson that he believed Rudwall was among the three weakest Money Fund employees, and that Rudwall's asset performance was weak, especially in light of the sales potential of Rudwall's territory. Mendelson Decl. ¶¶12-13. In a report dated October 17, 2008, Mendelson selected these three employees, including Rudwall, for termination. Lepowsky Decl. ¶6; Mendelson Decl. Ex 93 (Confidential CMG Expense Reduction Plan). They were ages 47, 56, and 58. Lepowsky Decl. ¶6. The parties dispute whether a fourth Money Fund employee, age 63, was terminated or retired voluntarily. *Id.*; Mendelson Decl. ¶11. The retained Money Fund employees ranged in age from 41 to 62. Lepowsky Decl. ¶6.

While Moran's declaration seems to suggest that he was not consulted in advance of the reduction-in-force, Mendelson states that he consulted with Moran before finalizing the list of Money Fund salespeople to be terminated. Moran Decl. ¶49; McGuinn Decl. Ex. C (Mendelson Depo. at 104-05). According to Mendelson, in advance of the reduction-in-force, Mendelson shared with Moran the list of people to be terminated, and Moran indicated that Mendelson had selected "the right set of people." McGuinn Decl. Ex. C (Mendelson Depo. at 105:10-11). Moran had supervised Rudwall since 1993, and theirs had become a contentious relationship. Moran Decl. ¶¶3, 6-48.[4] Trouble between them began in 2000, when Rudwall sent a letter to BlackRock's Chairman and C.E.O. complaining that he had not been compensated for his role in a large business deal. Moran Decl. ¶ 13. According to Rudwall, Rudwall was "seen thereafter by management in a bad light, i.e. as not a team player; a disgruntled employee or troublemaker." Rudwall Decl. ¶11. Starting in 2001, Moran became concerned that Rudwall was not embracing the technological changes taking place at the

---

[4] In his untimely evidentiary objections, Rudwall challenges two paragraphs in Moran's declaration: (1) Paragraph 10, in which Moran describes the changes he observed at the company and why those changes were implemented; and (2) Paragraph 23, in which Moran explains the basis for his evaluation of employees, including Rudwall. Rudwall contends that Moran has no personal knowledge of the facts in Paragraph 10. Yet Moran was involved in implementing the changes at BlackRock, and therefore would have personal knowledge of what they were and how they were implemented. To the extent that Rudwall challenges Moran's explanation of why BlackRock changed its approach, this evidence is irrelevant to the Court's analysis. Rudwall challenges Paragraph 23 as lacking personal knowledge and as improper lay opinion. These objections are overruled as to Moran for the same reasons they are overruled as to Mendelson.

company. Moran Decl. ¶¶12, 20. He noted Rudwall's treatment of BlackRock staff, as well as Rudwall's unwillingness to work cooperatively with other members of the sales team. *Id.* at ¶¶12-13, 20, 21. In his declaration, Moran recounts many instances in which he was at odds with Rudwall. Moran summarizes that "[f]rom December 2000 onwards, I found myself expending more time dealing with issues concerning Rudwall and it made my job as a manager more difficult." *Id.* at ¶21. Rudwall's performance evaluations show that starting in 2001, Moran documented his concerns regarding Rudwall's resistance to technology, his failure to collaborate, and, at times, his underwhelming sales results. McGuinn Decl. Ex. 15.

Rudwall has submitted evidence aimed at showing that age was the real reason for his termination. First, he offers evidence regarding the global financial crisis as it related to BlackRock. He points to portions of BlackRock's 2009 annual report in which the company's CEO said that he was "proud to say that BlackRock distinguished itself throughout the crisis and is one of a very few firms to emerge stronger and even more differentiated." McGuinn Dec. Ex. I. Rudwall notes that the company saw an increase in revenues between 2007 and 2008, and that the company merged with Barclay's Global Investors in December 2009. McGuinn Dec. Ex. I. The merger made BlackRock the world's largest investment management company. McGuinn Dec. Ex. I.

Second, Rudwall points to age-related statements made by Moran some seven years before Rudwall was terminated. In October of 2000, Moran sent Rudwall a handwritten note stating that his "lack of Automation is seen as a drawback to our [] competitive positioning. The landscape has changed and we're viewed as <u>rooted</u> in the past. We have to move forward." McGuinn Decl. Ex H (emphasis in original). In a December 2000 memo from Moran to BlackRock managers regarding Rudwall's failure to adapt to the company's team approach, known as "one BlackRock," Moran stated:

> When the San Francisco office is opened in the spring, Tom will either become (sic) and buy into "one BlackRock" or I'll be logging extra time as we attempt to save assets by replacing Tom.
>
> Incidentally, I would expand Scott Laudeman's territory and coverage for corporations, Hertzenberg for selecting bank customers and hire two *younger* sales types to fill in the gaps instead of the one I am looking to add anyway.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

*Id.* at Ex. F (emphasis added). Finally, in January 2001, Moran sent BlackRock managers an email regarding Rudwall. *Id.* at Ex. G. In it, he noted that "Tom's activity for the past quarter and on a year over year basis has been extremely high." *Id.* However: "I am continuing to look at *young people* as well as networking with headhunters and people in the business. I am hopeful that Tom will see the light and buy-in (sic) to email [and other computer applications]."[5] *Id.* (emphasis added).

Third, Rudwall points out that in 2004, BlackRock hired four new Money Fund salespeople, three of whom were age 37 and one of whom was age 43. Dosanjh Decl. ¶3; Rudwall Decl. ¶23. One of the new 37-year-old salespeople, Paul Kline, was assigned a large portion of Rudwall's sales territory. Rudwall Decl. ¶22. Rudwall was left with Northern California and Kline took over Oregon, Washington, Idaho, and Alaska.[6] *Id.* at ¶24.

Fourth, Rudwall contends that he was an excellent employee. According to Rudwall, there is "evidence in the record that Rudwall made every effort to use BlackRock's technologies and to incorporate 'automation' into the performance of his duties." Opp'n at 17: 20-22. To show that he was a team player, Rudwall points to sales he made that involved collaboration among salespeople. Rudwall Dec. ¶31. Rudwall contends that his assets surpassed $7 billion in 2008.[7] Opp'n at 18:1.

Finally, Rudwall has produced statistical analyses by Professor William Lepowsky ("Lepowksy") that purportedly demonstrate, to a statistically significant degree, that "age was a factor in the terminations." Lepowsky Decl. ¶8. Using information provided by BlackRock about the ages of all Money Fund salespeople at the time of the reduction-in-

---

[5] In his opposition, Rudwall refers to a fourth memorandum that purportedly says: "During the discussion, I pointed out to Tom that his ability to sell the BPIF funds continues at a high level. The issue has been that Tom has shown an unwillingness to attempt to change from his standard procedures." Opp'n at 13. Rudwall does not provide a citation to this document, but assuming it exists, it does not change the Court's analysis.

[6] Rudwall contends that Kline was assigned Rudwall's Northern California territory after Rudwall was terminated, but he does not cite any facts in the record supporting this contention. Assuming it is true, it does not change the Court's analysis.

[7] Rudwall's citation for this figure does not correspond with an exhibit in the record. Assuming it is true, it does not alter the Court's analysis.

6

United States District Court

For the Northern District of California

1    force, Lepowsky conducted three kinds of statistical analyses to determine whether there was

2    a correlation between an employee's age and his reduction-in-force status.[8] The first analysis

3    examined the average age of the terminated Money Fund employees compared to the average

4    age of the retained Money Fund employees. *Id.* at ¶12. Lepowsky found that the average age

5    of the terminated employees was 56, while the average age of the retained employees was

6    47.9, and that the difference between these figures is statistically significant. *Id.* at ¶9. The

7    second analysis ranked each Money Fund employee in order of age, with the oldest employee

8    ranked first, and then averaged the age ranks of the terminated employees and the retained

9    employees. *Id.* at ¶15. This analysis "provides evidence that age was a factor in the selection

10   of employees" to be terminated because the average age rank of terminated employees was 4,

11   while the average age rank of the retained employees was 8.9. *Id.* at ¶¶15-16. The final

12   analysis Lepowsky conducted regarding Money Fund employees was a logistic regression

13   analysis that estimated whether and to what extent the probability of being selected for the

14   reduction-in-force increased with age. *Id.* at ¶17. Lepowsky found that while only 3 percent

15   of employees aged 40 to 45 were likely to be terminated, that percentage increased through

16   five-year age brackets to 58 percent for employees age 65 and older. *Id.* at  ¶20.

17          Rudwall filed suit against BlackRock in Superior Court for the City and County of

18   San Francisco on September 10, 2009. Docket No. 1 (Compl.). Rudwall alleged age

19   discrimination, breach of contract, quantum meruit, breach of the covenant of good faith and

20   fair dealing, wrongful termination in violation of public policy, and violations of the

21   California Labor Code. *Id.* Defendant removed the case to this Court on November 2, 2009.

22   *Id.*

23

24

25

---

26         [8] Two issues regarding Lepowsky's analyses are worth noting here. First, Lepowsky's
analyses count Herb Hassel among the terminated employees. Lepowsky Decl. ¶6. The

27   parties disagree as to the appropriateness of including him, but for the purpose of this motion,
the Court will assume Hassel should have been included. Second, Lepowsky's analyses of

28   non-Money Fund terminations are not described here because they are irrelevant to the
Court's analysis.

**United States District Court**
For the Northern District of California

**LEGAL STANDARD**

Summary judgment is appropriate when there is no genuine dispute as to material facts and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.* The Court may not weigh the evidence and must view the evidence in the light most favorable to the nonmoving party. *Id.* at 255.  The Court's inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

A party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof at trial, it must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). However, on an issue for which its opponents will have the burden of proof at trial, the moving party can prevail merely by "pointing out ... that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. If the moving party meets its initial burden, the opposing party must "set out specific facts showing a genuine issue for trial" to defeat the motion. Fed. R. Civ. P. 56(e)(2); *Anderson*, 477 U.S. at 256.

**DISCUSSION**

BlackRock asks the Court to grant summary judgment on several claims in Rudwall's Complaint: (1) age discrimination under the California Fair Employment and Housing Act, California Government Code section 12940 *et seq.* (first claim for relief); (2) breach of the covenant of good faith and fair dealing (third claim for relief); (3) quantum meruit (fourth claim for relief); and (4) wrongful termination in violation of public policy (fifth claim for

1    relief). Should the Court not grant BlackRock's motion with respect to Rudwall's age

2    discrimination claim, BlackRock asks the Court to find that (1) Rudwall's claim for age

3    discrimination based upon a disparate treatment theory fails as a matter of law; and (2)

4    Rudwall's claim for age discrimination based upon a disparate impact theory fails as a matter

5    of law.

6

7    **I. Age Discrimination under Fair Employment and Housing Act**

8    **A. Disparate Treatment**

9         Rudwall brings his first claim pursuant to California's Fair Employment and Housing

10   Act ("FEHA"), which prohibits employers from discriminating against or harassing

11   employees "because of" their age.  Cal. Govt. Code § 12940. In disparate treatment age

12   discrimination claims "under FEHA, plaintiffs can prove their cases in either of two ways: by

13   direct or circumstantial evidence." *DeJung v. Superior Court*, 169 Cal. App. 4th 533, 549

14   (2008).

15   **1. Direct Evidence of Discrimination**

16        Plaintiff argues that he has presented direct evidence that he was terminated because

17   of age discrimination. "Direct evidence is evidence which, if believed, proves the fact of

18   discriminatory animus without inference or presumption. Comments demonstrating

19   discriminatory animus may be found to be direct evidence if there is evidence of a causal

20   relationship between the comments and the adverse job action at issue." *DeJung*, 169 Cal

21   App. 4th at 550. Rudwall does not cite this standard, and he offers no analysis as to whether

22   Moran's comments regarding age qualify as direct evidence of age discrimination. In

23   *DeJung*, the court found that comments by a supervisor regarding the supervisor's desire to

24   fill a specific position with a younger person to be direct evidence that an older worker not

25   hired for the position was a victim of age discrimination. *Id.* Moran's comments were not so

26   direct – they relate to whether Rudwall might be terminated in 2001, not in 2008. In light of

27   the fact that Rudwall fails to analyze whether his evidence is direct, and this Court's view

28

United States District Court
For the Northern District of California

that inferences are required to link Rudwall's evidence to his ultimate termination, his discrimination claim hinges upon the strength of his circumstantial evidence.

## 2. Circumstantial Evidence of Discrimination: *McDonnell Douglas*

*a. Legal Framework*

In evaluating circumstantial evidence of discrimination, courts use the burden-shifting analysis set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Because of the similarity between California law under FEHA and federal employment discrimination laws, federal cases are instructive. *Guz v. Bechtel Nat. Inc*, 24 Cal. 4th 317, 354. The *McDonnell Douglas* framework, which was "developed to assess claims brought under . . . Title VII of the Civil Rights Act of 1964," *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 142 (2000), requires a plaintiff to make out a prima facie case by showing

> that (1) he was a member of a protected class, (2) he was qualified for the position he sought or was performing competently in the position he held, (3) he suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory motive.

*Guz*, 24 Cal. 4th at 355. "While the plaintiff's prima facie burden is not onerous, he must at least show actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on a [prohibited] discriminatory criterion." *Id.* (internal citations and quotation marks omitted, alteration in the original). Once the prima facie case is established, the burden of production shifts to the employer to "set forth competent, admissible evidence of its reasons, unrelated to" discrimination, why it took the allegedly adverse employment action. *Guz*, 24 Cal.4th at 357. The burden then shifts back to the plaintiff "to rebut this facially dispositive showing by pointing to evidence which nonetheless raises a rational inference that intentional discrimination occurred," *id.*, and "to show that the employer's reason was a pretext for discrimination." *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998). "Indeed, when the employer proffers a facially sufficient lawful reason for the challenged

10

United States District Court

For the Northern District of California

action, the entire *McDonnell Douglas* framework ceases to have any bearing on the case, and the question becomes whether the plaintiff has shown, or can show, that the challenged action resulted in fact from discriminatory animus rather than other causes." *Reeves v. Safeway Stores, Inc.*, 121 Cal. App. 4th 95, 112 (2004) (citation omitted).

The *McDonnell Douglas* test is designed to assure a plaintiff has "his day in court despite the unavailability of direct evidence." *Trans World Airlines, Inc. V. Thurston*, 469 U.S. 111, 121 (1985). It is applied in cases of pretext, where the plaintiff alleges the defendant has supplied a false, pretextual reason for the employment decision, and "discrimination was the real reason." *St Mary's Honor Ctr. V. Hicks*, 509 U.S. 502, 515 (1993). "In pretext cases, 'the issue is whether either illegal or legal motives, but not both, were the 'true' motives behind the decision.'" *Price Waterhouse v. Hopkins*, 490 U.S. 228, 260 (1989) (White, J., concurring in the judgment) (quoting *NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393, 400 n.5 (1983)). The parties contend that a recent Supreme Court decision, *Gross v. FBL Financial Services, Inc.*, -- U.S. ----, 129 S. Ct. 2349 (2009), has disturbed the *McDonnell Douglas* framework, or at least changed the way it is applied in cases such as Rudwall's.

In *Gross*, the Supreme Court held that the burden of persuasion in cases brought under the Age Discrimination in Employment Act ("ADEA") is different from the burden of persuasion in cases brought under Title VII. *Gross*, 129 S. Ct. At 2352. The Civil Rights Act of 1991 amended Title VII to explicitly authorize "discrimination claims in which an improper consideration was 'a motivating factor' for an adverse employment decision." *Gross*, 129 S. Ct. 2349 (2009); *see* 42 U.S.C. § 2000e-2(m) ("[A]n unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice."). "Unlike Title VII," the Court observed, "the ADEA's text does not provide that a plaintiff may establish discrimination by showing that age was simply a motivating factor." *Gross*, 129 S.Ct. at 2349. The Court concluded that the text of the ADEA – which bars an employer from discriminating against any individual

United States District Court

For the Northern District of California

"because of such individual's age," 29 U.S.C. § 623(a)(1) – does not authorize a plaintiff to prevail if age was merely "a motivating factor" in the adverse employment decision. *Gross*, 129 S. Ct. at 2350. Relying on the definition of "because of" – which means "by reason of" – the Court concluded that age had to be "the 'reason' that the employer decided to act." *Id.*

The parties each have a theory regarding *Gross*'s impact upon the instant case, and both are incorrect. BlackRock argues that *Gross* rejected the application of *McDonnell Douglas* in ADEA cases, and because California courts look to federal courts' interpretation of the ADEA in applying FEHA, *Wynn v. NBC*, 234 F. Supp. 2d 1067, 1093 (C.D. Cal. 2002); *Guz*, 24 Cal. 4th at 354, this Court should reject the *McDonnell Douglas* framework as well. Specifically, BlackRock argues that *Gross* rejected the step in *McDonnell Douglas* that shifts the burden of production to the employer to present legitimate reasons for the adverse employment action. *Gross* did reject a burden-shifting analysis, but not that of *McDonnell Douglas*.[9] *Gross*, 129 S.Ct. at 2352. Defendants fail to cite authority suggesting that *McDonnell Douglas* is no longer the appropriate standard for evaluating FEHA claims. The California Supreme Court's analysis in *Reid v. Google*, while not deciding the issue, refers to *McDonnell Douglas* as the appropriate framework under which to analyze FEHA age discrimination cases. *Reid v. Google*, 50 Cal. 4th 512, 520 n.2 (2010) ("In California, courts employ at trial the three-stage test that was established in *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668, to resolve discrimination claims, including age discrimination."); *accord* Chin, et al., *Cal. Practice Guide: Employment Litigation* ¶8-772 (Rutter Group 2010).

Rudwall has his own reading of *Gross*. He argues that he need not show that age discrimination was the "but for" cause of his termination, but only that age was "a motivating

---

[9] The framework *Gross* rejected as inapplicable to ADEA cases was established in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 260 (1989) (White, J., concurring in the judgment). Under that framework, a plaintiff's initial burden is to show that discrimination was a "motivating" or "substantial" factor in the employer's action, after which the burden of persuasion shifts to the employer, who escapes liability only by demonstrating that it would have reached the same decision even in the absence of the impermissible consideration. *Price Waterhouse*, 490 U.S. at 244-45 (plurality opinion); *id.* at 259 (White, J., concurring in the judgment); *id.* at 276 (O'Connor, J., concurring in the judgment).

United States District Court

For the Northern District of California

factor." He acknowledges that California courts look to federal decisions, like *Gross*, as an aid in interpreting FEHA. However, he cites *Page v. Superior Court*, which states that "it is not appropriate to follow federal decisions where the *distinct language of FEHA* evidences a legislative intent different from that of Congress." 31 Cal. App. 4th 1206, 1215-16 (1995) (emphasis added). That reasoning might cause this Court to interpret FEHA and the ADEA differently were it not for the fact that both statutes outlaw discrimination "because of" a person's age. *See* 29 U.S.C. § 623(a)(1); Cal. Govt. Code § 12940. The language of these statutes is identical, suggesting that the "but for" causation standard articulated in *Gross* applies here. This issue is currently before the California Supreme Court in *Harris v. City of Santa Monica*, 108 Cal. Rptr. 3d 555 (2010). In that case, an appeals court found error where a trial court failed to instruct the jury that an employer had a complete defense to sex discrimination if the employer would have terminated the plaintiff for legitimate reasons notwithstanding illegitimate ones. *Harris v. City of Santa Monica*, 106 Cal. Rptr. 3d 6, 12 (2010). This decision is not certified for publication and is of no precedential value. Cal. R. Ct. 8.1115(a). Other California cases, however, appear to apply the "but for" causation standard to FEHA claims. *See Reeves*, 121 Cal. App. 4th at 108; *Clark v. Claremont University Center*, 6 Cal. App. 4th 639, 665 (1992). While the Supreme Court could adopt a different standard when it decides *Harris*, other precedent, along with the Supreme Court's guidance in *Gross*, persuade the Court that Rudwall must prove that but for age discrimination, he would not have been fired.

*b. Analysis – Rudwall's Disparate Treatment Claim Does Not Survive Summary Judgment*

Assuming that Rudwall's evidence makes a prima facie case of age discrimination, it does not raise a question of fact as to whether BlackRock's legitimate reasons for terminating him were mere pretext.

According to BlackRock's evidence, the company implemented a reduction-in-force in November 2008 in response to the global financial crisis. The reason Rudwall was given for his termination supports this conclusion, and the company's 2009 annual report shows

**United States District Court**
For the Northern District of California

that net income declined from $1,077 million in 2007 to $856 million in 2008. Rudwall attempts to negate this evidence by arguing that BlackRock emerged from the financial crisis "virtually unscathed." Opp'n at 11: 20-21. Rudwall argues that BlackRock "was one of the few financial institutions to actually post a profit that year." *Id.* at 11: 20-22. He cites to BlackRock's 2009 annual report, in which the company's CEO said that he was "proud to say that BlackRock distinguished itself throughout the crisis and is one of a very few firms to emerge stronger and even more differentiated." McGuinn Dec. Ex. I. Rudwall notes the increase in revenues between 2007 and 2008, and the fact that BlackRock's "revenues remained strong enough" for the company to merge with Barclay's Global Investors in December 2009. Opp'n at 12:3-4; McGuinn Dec. Ex. I. The merger made BlackRock the world's largest investment management company. McGuinn Dec. Ex. I. Rudwall argues that these facts raise an inference that "BlackRock seized upon the global financial crisis as a convenient excuse to implement a [reduction-in-force] and rid itself of unwanted, older employees." Opp'n at 12:8-9. These facts raise no such inference. Rudwall ignores the fact that BlackRock's net income declined by 20 percent between 2007 and 2008. The fact that revenues increased during that time period, and the fact that BlackRock posted a profit at all in 2008, do nothing to negate the dire business implications of BlackRock's loss of net income. Nor does BlackRock's CEO's statement in the 2009 annual report refute BlackRock's contention that the reduction-in-force was a legitimate business strategy in November 2008. The statement was written in April 2010, and the strength of the company at that late date is irrelevant to whether BlackRock's decision to conduct layoffs in November 2008 was based upon the perceived imperatives of the global financial crisis. BlackRock's merger with Barclay's Global Investors more than a year after the reduction-in-force is also irrelevant. Rudwall presents no evidence indicating that the reduction-in-force was anything other than a legitimate business decision made in response to the global financial crisis.

BlackRock also presents evidence showing that the decision to include Rudwall in the reduction-in-force was based, at least in part, upon perceived problems with Rudwall's job performance. Rudwall presents no evidence suggesting that either Mendelson or Steinberg

14

1   had anything other than a good-faith belief that Rudwall was a poor performer. Rudwall's

2   own declaration states that he embraced automation, worked as a team, and was a superlative

3   salesman, yet these statements do nothing to suggest that Mendelson and Steinberg invented

4   their contrary impressions of Rudwall's performance as a pretext for age discrimination. At

5   most, Rudwall's evidence shows that he believed he was a good employee – not that his

6   bosses did. Rudwall argues that the performance issues cited by Mendelson and others are

7   "errant and misplaced," and that this is sufficient to establish pretext. *See Brewer v. Quaker*

8   *State Oil Refining Corp.*, 72 F.32d 326, 332 (3d Cir. 1995). Not only does Rudwall fail to

9   cite precedent from within the Ninth Circuit, he makes no showing that his superiors'

10  opinions of him were errant or misplaced. Mendelson offered specific experiences with

11  Rudwall that led him to question Rudwall's value as an employee. Sales figures aside,

12  Mendelson believed Rudwall was difficult to work with. He also judged Rudwall for a

13  decline in asset balance and a poor rate of face-to-face meetings with clients. Mendelson

14  believed Rudwall was, at best, average at generating new business. Even if Mendelson and

15  Steinberg were overly harsh in their assessment of Rudwall, the California Supreme Court

16  has said that an employer's "true reasons need not necessarily have been wise or correct."

17  *Guz*, 24 Cal. 4th at 358. They need only be nondiscriminatory. *Id.*

18          Rudwall argues that BlackRock's reasons for terminating Rudwall are suspect because

19  BlackRock produced no documents prepared at the time of Rudwall's termination citing his

20  performance as the basis for BlackRock's decision to terminate him. Rudwall cites no

21  authority in support of this argument, which fails to persuade the Court. Rudwall also argues

22  that Mendelson and others were incorrect in their assessment of Rudwall's job performance.

23  "[A]n employee's subjective personal judgments of her competence alone do not raise a

24  genuine issue of material fact." *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270 (9th

25  Cir. 1996). Here the only evidence casting doubt upon Mendelson and Steinberg's views of

26  Rudwall's performance is Rudwall's subjective personal judgments, and this evidence does

27  not raise a triable question of fact.

28

Moran's role in Rudwall's termination does not change this analysis. Moran had legitimate, non-discriminatory reasons for believing that Rudwall was a problem employee. Rudwall concedes one of these reasons. According to Rudwall, after writing a letter to the company's C.E.O. in 2000 complaining about his compensation, he was "seen thereafter by management in a bad light, i.e. as not a team player; a disgruntled employee or troublemaker." Rudwall Decl. ¶11. This is a nondiscriminatory reason for terminating Rudwall, and it is just as plausible as age discrimination. Even if the Court were to assume that Moran engaged in a seven-year campaign of age discrimination against Rudwall – starting in 2000 with Moran's comments,[10] continuing with the hiring of four younger salespeople in 2004, and culminating in his approval of Mendelson's list of the Money Fund salespeople selected for termination in 2008 – Rudwall has not demonstrated that age discrimination was the but-for cause of his termination. According to Mendelson, Moran's role in the terminations was limited to approving the list crafted by Mendelson and Steinberg. Thus at most, a jury could find that age discrimination was the but-for cause of Moran's approval of the employees already selected for termination. Rudwall's evidence cannot show what it must to let him prevail on this motion – that absent discrimination, Rudwall would have kept his job.

Rudwall's statistics fail to alter this analysis. According to Lepowsky, his statistical analyses show that age was a factor in the BlackRock terminations. But to prevail in a disparate treatment age discrimination claim, a plaintiff must show that age was the but-for cause of the adverse employment outcome. Lepowsky's analysis sheds no light upon whether job performance or other legitimate, nondiscriminatory factors were also at work. Rudwall's failure to cast doubt upon the legitimate reasons put forward by BlackRock means that he cannot show "that the challenged action resulted in fact from discriminatory animus rather than other causes." *See Reeves*, 121 Cal. App. 4th at 112. Accordingly, BlackRock's motion

---

[10] In light of *Reid*, 50 Cal. 4th at 541, the Court views these comments in light of the "totality of evidence in the record."

United States District Court

For the Northern District of California

1  for summary judgment as to Rudwall's disparate treatment age discrimination claim is

2  GRANTED.

3

4  **B. Disparate Impact**

5          In order to prevail on a disparate impact claim under FEHA, a plaintiff must prove

6  that a challenged employment policy or practice, while facially neutral, had a disparate

7  impact on employees in a protected group. *Katz v. Regents of the Univ. of Cal.*, 229 F.3d 831,

8  835 (9th Cir. 2000). "To state a prima facie case under a disparate impact theory, a plaintiff

9  must demonstrate (1) the occurrence of certain outwardly neutral employment practices, and

10 (2) a significantly adverse or disproportionate impact on persons of a particular [age]

11 produced by the employer's facially neutral acts or practices." *Id.* (internal quotation

12 omitted). Once a plaintiff has established a prima facie case, the burden shifts to the

13 defendant who may either (1) "discredit the plaintiff's statistics or proffer statistics of his own

14 which show that no disparity exists[, or (2)] produce evidence that its disparate employment

15 practices are based on legitimate business reasons, such as job-relatedness or business

16 necessity." *Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1424 (9th Cir. 1990). "Thereafter, the

17 plaintiff must show that other tests or selection devices, without a similarly undesirable

18 [discriminatory] effect, would also serve the employer's legitimate interest in efficient and

19 trustworthy workmanship." *Id.* (internal quotations omitted) (alteration in original).

20         Rudwall identifies the process Mendelson used to select Money Fund employees for

21 termination as the policy or practice at issue here. "[A]n employer's facially neutral practice

22 of committing employment decisions to the subjective discretion of supervisory employees

23 [is] a specific employment practice properly subject to a disparate impact analysis." *Id.*

24 BlackRock seems to concede that Mendelson's use of discretion is a policy or practice that

25 could be the basis of a disparate impact claim. However, it argues that Rudwall never

26 identified this employment practice in his Complaint or in responses to interrogatories, and

27 that Rudwall's failure to do so is grounds for summary judgment. *See Celotex*, 477 U.S. at

28 325. Rudwall correctly counters that BlackRock has offered no authority stating that the

17

United States District Court

For the Northern District of California

1  exact policy alleged to have violated FEHA must be pleaded in the Complaint. Furthermore,

2  even if Rudwall's interrogatory responses were insufficient, BlackRock fails to persuade the

3  Court that this insufficiency demonstrates an absence of evidence in the record. To the

4  contrary, Rudwall's opposition cites to Mendelson's deposition in which he describes the

5  process he went through to select the four Money Fund salespeople for termination. Thus

6  Rudwall properly identifies a neutral employment practice.

7        Nonetheless, Rudwall fails to make a prima facie case of disparate impact

8  discrimination because he fails to show that the employment practice had an adverse or

9  disproportionate impact on a protected group. Because Rudwall challenges Mendelson's

10  decisions with respect to Money Fund employees, the correct population is the group of

11  Money Fund employees considered for termination. *See Moore v. Hughes Helicopters, Inc.*,

12  708 F.2d 475, 482 (9th Cir. 1983) ("Disparate impact should always be measured against the

13  actual pool of applicants or eligible employees unless there is a characteristic of the

14  challenged selection device that makes use of the actual pool of applicants or eligible

15  employees inappropriate."). Rudwall seems to agree, and data that analyze terminations

16  outside the Money Fund are irrelevant.[11]

17        Like the district court in *Schechner v. KPIX-TV*, this Court "has serious doubts" that

18  Rudwall has identified an affected group large enough to be statistically significant. No. C08-

19  05049 MJP, 2011 WL 109144, at *5 n.5 (N.D. Cal. Jan. 13, 2011) (citing *Beale v. GTE Cal.*,

20
21      [11] In his opposition papers, Rudwall seems to admonish BlackRock for suggesting that
employees outside the Money Fund are part of the appropriate population for statistical
22  analysis. Opp'n at 22:2-6. However, he also argues that "[w]hether the population identified
by an employer should be the <u>only</u> legally relevant focal point for statistical analysis, or
23  whether statistical results may be presented at various levels of generality or specificity, is a
determination to be made on the weight of the evidence and must be evaluated by the finder
24  of fact." *Id.* at 20:19-22 (emphasis in original). Rudwall is incorrect as to the role of the trier
of fact – he presents no authority holding that the trier of fact must determine the relevance
25  of aggregated statistical data. Rudwall is correct insofar as "aggregated statistical data may
be used where it is more probative than subdivided data." *Paige v. California*, 291 F.3d
26  1141, 1148 (9th Cir. 2002). However, the Court has been presented with no argument or
evidence suggesting that statistical analyses showing disparate impact elsewhere in the
27  company would be probative of disparate impact within the Money Fund. Unlike *Paige*,
there is no evidence indicating that Money Fund and non-Money Fund employees were
28  "similarly situated and affected by common policies." *See* 291 F.3d at 1148-49. And unlike
*Ellis v. Costco Wholesale Corporation*, no evidence suggests company-wide oversight of
Mendelson's decision-making. *See* 240 F.R.D. 627, 649 (N.D. Cal. 2007).

United States District Court
For the Northern District of California

999 F. Supp. 1312, 1323 (C.D. Cal. 1996) (Wardlaw, J.) ("The Ninth Circuit has warned district courts not to base a disparate impact finding on a statistical sample that is too small."). In *Schechner*, it was undisputed that five employees had been terminated; here four people comprise the affected group. However, assuming that statistics derived from such a small group are significant, BlackRock argues that they fail to answer the only question relevant to a disproportionate impact analysis – whether the terminations had a disproportionate impact on the protected group. In age discrimination cases, the protected group consists of "individuals who are at least 40 years of age." *Katz*, 229 F.3d at 835. BlackRock contends that even if Rudwall's statistical evidence shows that older Money Fund workers were disproportionately impacted by the layoffs, it does not show that Money Fund workers aged 40 and over were disproportionately impacted because all Money Fund workers at the time of the 2008 reduction-in-force were older than 40 years old.

The Ninth Circuit has not decided this issue, and the Court is not aware of a California state court decision on point. However, "[e]very court of appeals decision addressing this issue has concluded that it is improper to distinguish between subgroups of employees over the age of 40 and that a disparate impact analysis must compare employees aged 40 and over with those 39 and younger." *Schechner*, 2011 WL 109144, at *4 (citing *EEOC v. McDonnell Douglas Corp.*, 191 F.3d 948, 950-51 (8th Cir. 1999); *Lowe v. Commack Union Free School Dist.*, 886 F.2d 1364, 1373 (2d Cir. 1989); *Smith v. Tenn. Valley Auth.*, 924 F.2d 1059 (6th Cir. 1991) (unpublished)). As the Eighth Circuit explained:

> [I]f such claims were cognizable under the statute, a plaintiff could bring a disparate-impact claim despite the fact that the statistical evidence indicated that an employer's [reduction-in-force] criteria had a very favorable impact upon the entire protected group of employees aged 40 and older, compared to those employees outside the protected group . . . [I]f disparate-impact claims on behalf of subgroups were cognizable under the ADEA, the consequence would be to require an employer engaging in a [reduction-in-force] to attempt what might well be impossible: to achieve statistical parity among the virtually infinite number of age subgroups in its work force. Adoption of such a theory, moreover, might well have the anomalous result of forcing employers to take age into account in making layoff decisions, which is the very sort of age-based decision-making that the statute proscribes.

19

United States District Court

For the Northern District of California

1    *EEOC v. McDonnell Douglas Corp.*, 191 F.3d at 951. The district court in *Schechner*

2    adopted this reasoning, as did the district court in *Kinnally v. Rogers Corp.*, No. C98-0045

3    MJM, 2009 WL 597211, at *2 (D.Ariz. Mar. 9, 2002). This Court agrees. It is not enough for

4    Rudwall to offer evidence that the 2008 layoffs disproportionately impacted older workers.

5    "Instead, the focus is on whether older employees, as a protected *group*, are

6    disproportionately affected by a facially neutral employment practice." *Schechner*, 2011 WL

7    109144, at *4 (emphasis in original). This focus does not leave older workers unprotected –

8    "where discrimination occurs 'within' a protected group, e.g., where those in their fifties are

9    discriminated against in favor of those in their forties, there is nothing to prevent a 55 year

10   old plaintiff from prevailing on a disparate treatment claim." *Lowe*, 886 F.2d at 1372.

11   Rudwall's relevant statistical data fail to compare the impact of BlackRock's 2008

12   terminations on employees aged 40 and older to the impact on those aged 39 and younger,

13   and thus they fail to support a prima facie case of disparate impact age discrimination.

14          When asked to address this issue at oral argument, Rudwall's counsel dismissed

15   *Schechner* as reliant upon the law of other circuits. The Court should look instead to the

16   California Supreme Court decision in *Reid*, counsel said, arguing that the case established

17   that the validity of statistical evidence is the province of the jury. In fact, the admissibility of

18   statistical evidence was beyond the scope of *Reid*. 50 Cal. 4th at 545 n. 14.

19          Based upon the foregoing analysis, BlackRock's motion for summary judgment as to

20   Rudwall's disparate impact age discrimination claim is GRANTED.

21

22   **II. Breach of Contract Covenant of Good Faith and Fair Dealing**

23          BlackRock challenges Rudwall's second claim for relief for breach of the covenant of

24   good faith and fair dealing on the grounds that it duplicates Rudwall's second claim for relief

25   for breach of contract. BlackRock cites *Careau & Company v. Security Pacific Business*

26   *Credit, Inc.*, which states that

27                    [i]f the allegations do not go beyond the statement of a mere
                      contract breach and, *relying on the same alleged acts*, simply
28                    seek the same damages or other relief already claimed in a
                      companion contract cause of action, they may be disregarded as

> superfluous as no additional claim is actually stated. Thus, absent those limited cases where a breach of a consensual contract term is not claimed or alleged, the only justification for asserting a separate cause of action for breach of the implied covenant is to obtain a tort recovery.

222 Cal. App. 3d 1371, 1395 (1990) (emphasis added). According to Rudwall, both claims survive here because they do not rely on the same acts – the breach of the covenant claim is based upon the allegation that BlackRock wrongfully terminated Rudwall to avoid paying him a bonus in 2008, and his breach of contract claim is based upon the allegation that BlackRock did not pay Rudwall a bonus in 2008. The Court agrees. Whether Rudwall seeks identical relief under these claims is irrelevant under *Careau* where, as here, the claims challenge separate conduct. In BlackRock's reply, the company argues that Rudwall has produced no evidence that the reason BlackRock terminated Rudwall was to avoid paying him a bonus. That may be true, but because this argument was made for the first time in BlackRock's reply, Rudwall was not afforded an opportunity to respond with citations to evidence in the record. "It is well established in this circuit that the general rule is that appellants cannot raise a new issue for the first time in their reply briefs." *Eberle v. City of Anaheim*, 901 F.2d 814, 818 (9th Cir. 1990) (citations, quotations, and alteration omitted). Accordingly, BlackRock's motion for summary judgment as to Rudwall's second claim for relief is DENIED.

## III. Quantum Meruit

BlackRock moves for summary judgment on Rudwall's fourth claim for quantum meruit on the grounds that such a claim cannot be brought "when the parties have an actual agreement covering compensation." *Hedging Concepts v. First Alliance Mortgage Co.*, 41 Cal. App. 4th 1410, 1419 (1996). However, Rudwall points out that in California, quantum meruit is available when an employee renders services pursuant to a contract that does not specify the exact amount of compensation to be paid for those services. Cal. Civ. Code § 1611; *Meredith v. Marks*, 212 Cal. App. 2d 265, 272-72 (1963) ("If a contract for services is not certain as to the amount of compensation, a suit in quantum meruit is proper, and the

value of the services should then be fixed by the trier of fact."). BlackRock makes no argument as to this claim in its reply. Because Rudwall's compensation was not fixed, BlackRock's motion for summary judgment as to Rudwall's quantum meruit claim is DENIED.

**IV. Wrongful Termination in Violation of Public Policy**

In his Complaint, Rudwall alleges that he was wrongfully terminated in violation of public policy when BlackRock fired him in retaliation for (1) his efforts to negotiate the terms and conditions of his employment, including the amount of bonus paid to him, and (2) for hiring an attorney to assist him in negotiating the conditions of his employment. BlackRock argues that there is no evidence that Rudwall was terminated for these reasons, and that even if there were, BlackRock's conduct did not violate public policy. In his Complaint, Rudwall highlights a letter he sent to BlackRock managers on November 7, 2008, asking them to reward his best-ever sales year with a $650,000 bonus. He was fired eleven days later. BlackRock argues that Rudwall's letter to managers could not have triggered his termination because it postdated an October 17, 2008 draft of BlackRock's cost reduction plan. This cost reduction plan named Rudwall among the employees to be terminated.

In response to Defendant's argument that terminating an employee for negotiating compensation does not violate a fundamental public policy, Rudwall argues in his opposition that his claim is based upon a different allegation – that BlackRock terminated Rudwall in order to avoid paying him a bonus for his performance in 2008. California law holds that an employer violates public policy when it terminates an employee in order to avoid paying him earned compensation, including commissions. *Gould v. Maryland Sound Industries, Inc.*, 31 Cal. App. 4th 1137, 1148 (1995). Even if the Court were to accept Rudwall's proffered public policy violation, Rudwall's opposition fails to cite evidence in the record supporting this claim. At oral argument, Rudwall's counsel argued that the following facts preclude summary judgment: (1) Rudwall was terminated in November 2008, just before bonuses were decided; (2) BlackRock made a "post-hoc" assertion that a person must be employed by

22

United States District Court
For the Northern District of California

1    BlackRock to get a bonus; and (3) BlackRock did not pay any of the terminated Money Fund

2    salespeople bonuses for 2008. In support, Rudwall cited an interrogatory in which

3    BlackRock asserted that a person must be employed at BlackRock to receive a bonus, and

4    that is why none of the terminated Money Fund salespeople received bonuses. McGuinn

5    Decl. Ex. D (Response to Interrog. 14). Rudwall cited no facts indicating when BlackRock

6    typically decides or pays bonuses. He also failed to cite any evidence that BlackRock's bonus

7    policy was post-hoc. "As other courts have noted, it is not our task, or that of the district

8    court, to scour the record in search of a genuine issue of triable fact. We rely on the

9    nonmoving party to identify with reasonable particularity the evidence that precludes

10   summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1278 (9th Cir. 1996) (citation,

11   quotation, and alteration omitted). The facts offered by Rudwall are not enough to raise a

12   genuine issue of material fact as to whether the reduction-in-force and Rudwall's termination

13   were motivated by a desire to avoid paying Rudwall a bonus in 2008. Furthermore, these

14   facts were not put forward in Rudwall's opposition, leaving BlackRock no opportunity to

15   respond. Accordingly, BlackRock's motion for summary judgment as to Rudwall's claim for

16   wrongful termination in violation of public policy is GRANTED.

17

18   **CONCLUSION**

19        BlackRock's motion for summary judgment is GRANTED IN PART and DENIED IN

20   PART. Summary judgment is granted as to Rudwall's first claim for relief for age

21   discrimination and fifth claim for relief for wrongful termination in violation of public

22   policy. Summary judgment is denied, however, as to Rudwall's third claim for breach of the

23   implied covenant of good faith and fair dealing and fourth claim for quantum meruit.

24

25

26

27   **IT IS SO ORDERED.**

     Dated: 2/25/11

28   _____
     THELTON E. HENDERSON, JUDGE
     UNITED STATES DISTRICT COURT
     23